**Gary Wayne THOMPSON,
et al., Plaintiff,**

**v.**

**FEDERAL EXPRESS CORPORATION,
Defendant.**

**Civ. A. No. 91–254–4–MAC(DF).**

United States District Court,
M.D. Georgia,
Macon Division.

Dec. 16, 1992.

James E. Butler, Jr., Peter J. Daughtery, Charles Frederick Overby, Columbus, GA, for plaintiff.

Robert C. Norman, Jr., Howard Jerome Strickland, Jr., Macon, GA, for defendants.

FITZPATRICK, District Judge.

Before the court are the parties' cross motions for summary judgment. Because Plaintiff's declaratory judgment pleading did not demand a jury, and because the counterclaim in this action was filed under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1988), neither party was entitled to a jury trial. The parties have stipulated, at the court's suggestion, that the case is to be decided by the court from the record presented through discovery. No additional facts would be available from a trial to the court and no benefit would be gained from hearing the testimony of the witnesses in this action. The court's present order will treat this case as if it had been tried to the court in accordance with the stipulation of the parties.

## FINDINGS OF FACT

On March 29, 1989, Gary Wayne Thompson was seriously injured in a collision with a tractor-trailer. (Paragraph 9 of Complaint admitted by Defendant). At the time of the accident, Mr. Thompson was employed by Federal Express. (Paragraph 6 of Complaint admitted by Defendant).

Federal Express provides its employees, at no cost to them, medical expense benefits and disability benefits through the Fed-

eral Express Corporation Group Health Plan, the Federal Express Corporation Short Term Disability Plan, and the Federal Express Long Term Disability Plan ("the Plans"). (Exhibits A–G to Complaint). As required by ERISA, Federal Express provides a booklet to its employees that is designed to simplify and accurately explain the terms of the various benefit plans. (Exhibit "I" to First Amendment to Complaint admitted by Defendant at paragraph 29 of Answer to First Amendment to Complaint). If the injury or illness for which benefits are claimed is the fault of a third party, the plans require the employee to execute a "Subrogation/Reimbursement Agreement" prior to the payment of any claims. ("Your Employee Benefits" Booklet at 2–39 to 2–40, 3–5, and 3–10).

Various people filed claims on behalf of Gary Wayne Thompson against the benefit plans sponsored by Federal Express. At some time after the accident, health care providers submitted claims for medical benefits to Federal Express. (Deposition of D. Thompson, Exhibit D–5).[1] On May 11, 1989, Mrs. Thompson filed a claim for short term disability payments with Federal Express. (Exhibit D–2).

Prior to processing these claims, Federal Express required that a subrogation/reimbursement agreement be executed. A representative of the claims division sent an interoffice memorandum to Mr. Thompson with a subrogation agreement attached. In a letter to Federal Express, attorneys for Mrs. Thompson acknowledged Federal Express's right to reimbursement for medical expenses. (Appendix 1 to Defendant's Brief in Opposition to Motion for Summary Judgment). Mrs. Thompson, through her attorneys, negotiated with Federal Express concerning the subrogation/reimbursement agreement requirement. (Exhibits D–4, D–5, D–6). On July 24, 1989, she executed a modified version of the subrogation/reimbursement agreement as "Wife of Gary Wayne Thompson." (Exhibit D–6A). The modification allowed Mrs. Thompson to strike through the portion of the agreement providing for reimbursement from re-

covery had by the covered employee's dependents.

The Thompsons filed a complaint against the third party tortfeasor on December 1, 1989. (Civil Action No. 89–400–1–MAC(DF)). Federal Express requested periodic updates on the progress of the case. The Thompson's attorneys responded to one of those letters, stating that the case was still pending and that Federal Express would be apprised of further developments.

Mrs. Thompson received and deposited, or had deposited for her, weekly, short term disability checks from Federal Express between April 14, 1989, and October 20, 1989. (Exhibit D–18, D. Thompson Deposition at 106). Beginning in November 1989, Mrs. Thompson received and deposited monthly long term disability checks from Federal Express. (Exhibit D–17).

Mrs. Thompson was appointed guardian of her husband's person and property by the Probate Court of Coweta County on April 22, 1991. (Exhibit D–8). Subsequent to becoming Mr. Thompson's legal representative, Mrs. Thompson continued to accept benefit checks from the long term disability plan in April, May and June of 1991. (Exhibit D–17). The record is unclear whether any medical benefits were paid during these three months. The Thompsons' attorneys returned the long term disability checks for the months of July and August, 1991, to Federal Express. (Exhibit D–25, D. Thompson Deposition at 134).

The Thompsons settled their claim against the third party tortfeasor in July 1991. (Exhibit D–19). The settlement agreement was a general and complete release and in satisfaction of all claims against the third party tortfeasor arising from the traffic accident on March 29, 1989, including any rights to subrogation. (Exhibit D–19, paragraph 1.1). The settlement agreement provided for a cash payment immediately and a structured periodic payment to Mr. Thompson guaranteed for

---

1. For convenience, further citations to exhibits from Ms. Thompson's deposition will be identified only by the exhibit number.

30 years. (Exhibit D–19, paragraphs 2.1 and 2.2). At the time the settlement agreement was executed, the present value (value of the future payments discounted to current cash value) of the structured portion of the settlement was just over $1.6 million.

Federal Express has paid a total of $438,-800.87 in benefits under all three plans— $423,070 in medical benefits, $8,549.48 in short term disability benefits, and $7,181.39 in long term disability benefits. (Stipulated between the parties).

The present value of the projected loss of income and cost of care for Mr. Thompson's lifetime, not including *past* medical expenses, was just under $4 million. (Exhibit D–28; Affidavit of Dr. J. Brown). The total present value of the settlement of all claims, those of Mr. Thompson and those of Mrs. Thompson, against the third party equalled $4 million.

## DISCUSSION

Before the court is an agreement between the parties that relates to a benefit plan covered by ERISA. The agreement is signed by Mrs. Thompson as "Wife of Gary Wayne Thompson," the covered employee within the meaning of the Plans. The critical issue the court must address is whether this agreement is binding on Mr. Thompson. This issue is a question of contract law, i.e., state law. Whether the agreement is binding is not a question that need be addressed by federal law interpreting ERISA. The law of the State of Georgia (where the contract was executed and performed) governs whether Mr. Thompson is bound by a contract executed by his wife.

If the court finds the contract binding, there is another issue that must be resolved, i.e., whether the agreement requires reimbursement of disability payments as well as the medical benefit payments made by Federal Express. This second issue requires application of the federal common law interpreting ERISA.

## I. Enforceability of the Reimbursement Agreement

Plaintiff, Gary Wayne Thompson, is obligated under the "Subrogation/Reimbursement Agreement" to repay Federal Express for the medical benefits he received under the Group Health Plan.[2] This agreement was executed by his wife, with assistance of counsel representing both of them, for Mr. Thompson's benefit, and when he was incapable of signing the form for himself. The Court finds that the agreement is enforceable against Mr. Thompson because the agreement was ratified by Mr. Thompson and his legal representative.

### A. Ratification of the Agreement

 Mrs. Thompson did not have the authority to execute the reimbursement agreement and bind her husband to repay Federal Express for benefits he received from his employer that were later recovered from the third party tortfeasor. Spouses are not generally agents for each other. *See, e.g., Oglesby v. Farmers Mut. Exchange,* 128 Ga.App. 387, 196 S.E.2d 674 (1973) (wife may be agent for husband for certain purchases). Therefore, Mr. Thompson may only be bound by this contract if he, or his legal representative, later ratified Mrs. Thompson's unauthorized action. *Southern Motors of Savannah, Inc. v. Krieger,* 86 Ga.App. 574, 71 S.E.2d 884 (1952) (*overruled on other grounds by Brown v. Techdata Corp.,* 238 Ga. 622, 234 S.E.2d 787 (1977)).

In this case, the reimbursement agreement was signed by Mrs. Thompson without her husband's authorization. He was incapable of authorizing her to act on his behalf because he had been severely injured. In April 1991, she was appointed his

---

**2.** The Agreement is the controlling factor in this case, and the Court expresses no opinion on whether the Plans themselves obligate the benefit recipient to reimburse Federal Express for medical benefits paid. It does not matter. Federal Express required that the subrogation/reimbursement agreement be executed before it would even process the claims that had already been submitted. Therefore, it is the Agreement that is the concern of the court, not whether the Plans obligate the recipient to reimburse for payments that are the responsibility of a third party.

guardian by the Probate Court of Coweta County, Georgia. She accepted, endorsed, and deposited long term disability benefit checks from Federal Express in April, May and June. She accepted these benefits, after having been named Mr. Thompson's legal representative, with the knowledge that she had previously signed the reimbursement agreement on his behalf. The court finds that this conduct by Mrs. Thompson effectively ratified her earlier unauthorized action. Once she became her husband's legal representative, Mrs. Thompson was legally authorized to bind him by her actions. She did precisely that when she ratified her earlier signing of the reimbursement agreement.

### B. Plaintiff's Arguments

Mr. Thompson argues vehemently that he is not bound by the agreement signed by his wife. He bases this conclusion on four points. First, that Mrs. Thompson was forced to sign the agreement under duress. Second, Plaintiff argues that his settlement with the third party tortfeasor did not make him whole; therefore, he should not have to reimburse Federal Express for past medical expenses. Third, is the argument that Federal Express's sole and exclusive remedy is to withhold future benefits until the amount to be reimbursed is recouped. Fourth, and last, is Plaintiff's argument that the agreement is an impermissible assignment, under Georgia Law, of a personal injury claim.

■ There is simply no evidence of any duress in the execution of this agreement. The court agrees that the impersonal manner with which Federal Express initially approached this situation is well short of ideal.[3] However, it does not begin to approach that level of conduct that would constitute duress under Georgia law. " '[E]conomic duress' involves the taking of undue or unjust advantage of a person's economic necessity or distress to coerce him into making a contract ... However, a duress claim of this nature must be based upon acts or conducts of the opposite party which are wrongful or unlawful." *Charter Medical Management Co. v. Ware Manor, Inc.,* 159 Ga.App. 378, 283 S.E.2d 330, 334 (1981) (citations omitted). The conduct of Federal Express, while impersonal, was neither wrongful nor unlawful. There was no duress present when Mrs. Thompson signed the reimbursement agreement.

■ Plaintiff next argues that the settlement agreement with the third party tortfeasor did not fully compensate Mr. Thompson for his injuries. Plaintiff's expert economist placed a present value on the loss of future earnings, future benefits lost, and life care plan at just under $4 million. His evidence took no consideration of past medical expenses. Mr. Thompson argues that, because he received just over $3.1 million,[4] he was not fully compensated.

This argument is unpersuasive because it fails to account for the "full and general release" both Mr. Thompson and his legal representative signed with the third party tortfeasor. Mr. and Mrs. Thompson executed the release of all of their claims against the tractor trailer company in exchange for the amount tendered by the company. As a result of the release and settlement agreement, Mr. Thompson's damages were fixed and fully compensated. The disputed claim was fully satisfied by the execution of the agreement. *See Bell v. Federal Kemper Ins. Co.,* 693 F.Supp. 446, 450 (S.D.W.Va.1988).

---

3. Nearly all of the correspondence from Federal Express to the Thompsons was addressed to Mr. Thompson. In fact, some of this mail was sent to him as interoffice memoranda—to his work section. It appears that the claims department at Federal Express made no effort to determine the nature or extent of Mr. Thompson's injuries until it received a letter from the Thompson's attorney. The court reasserts that this is not conduct that is in any way wrongful or unlawful and, therefore, there is no duress.

4. Federal Express continually reminds the court that the annuity paid to Mr. Thompson over his lifetime comes to substantially more than this amount. Federal Express fails to realize that, for any meaningful discussion of the economics of this case, all funds must be discounted to their present value.

Mr. Thompson next argues that Federal Express's sole and exclusive remedy is to withhold any further payments of benefits until the amount due is recouped. Presumably Federal Express could recover the amount it had already paid by withholding payment for any future claims submitted by the Thompson family until the $430,000 was "repaid". Federal Express might accomplish this recovery by offsetting accounting entries.

The court finds no merit to this argument. A common sense reading of the reimbursement agreement clearly envisions that Federal Express has a right to an actual monetary recovery of the funds it has already expended. The court will not participate in stretching the plain meaning of the contract beyond recognition in order to accommodate the desires of one of the parties.

■ The final argument Mr. Thompson advances is that the reimbursement agreement is an impermissible assignment of a personal injury claim. Such assignments are illegal under Georgia law. Even if the reimbursement agreement is an assignment of a personal injury claim, this argument does not help Plaintiff. The Supreme Court has held that such anti-subrogation laws are preempted by ERISA. *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). For such a clause to be preempted, the state law must relate to insurance. The case cited by Plaintiff, *Wrightsman v. Hardware Dealers Mut. Fire Ins. Co.*, 113 Ga.App. 306, 147 S.E.2d 860 (1966), strikes the subrogation clause from an insurance contract issued by Defendant in that case. As Plaintiff correctly points out, the language held unenforceable in *Wrightsman* was very similar to the subrogation/reimbursement agreement in this case. This court finds,

therefore, that Georgia's law prohibiting assignment of a personal injury claim relates to insurance. Under the holding of the Court in *FMC Corp. v. Holliday*, the state law is preempted and does not apply to this case. 498 U.S. at 64–65, 111 S.Ct. at 411.

## II. Amount is to be Reimbursed

After careful, thorough and comprehensive consideration, the court has determined that the reimbursement agreement is binding against Mr. Thompson. What remains, then, is to resolve the amount to be reimbursed to Federal Express.

### A. Disability Benefits

■ The "Your Employee Benefits" Booklet ("the booklet") is a Summary Plan Document ("SPD") within the meaning of ERISA. This fact is not seriously challenged by Federal Express. The United States Court of Appeals for the Fifth Circuit held earlier this year that to qualify as an SPD, the summary must contain all or substantially all of the required information in 29 U.S.C. § 1022 and the regulations, 29 C.F.R. § 2520.102–3. *Hicks v. Fleming Cos.*, 961 F.2d 537 (5th Cir.1992). The booklet qualifies as an SPD under this very strict standard.[5]

Since the booklet is an SPD, any conflict between the Plans and the booklet is resolved by examining the booklet. The SPD is a statutorily required means of informing plan participants of their rights and responsibilities under an ERISA governed benefit plan. *Hicks*, 961 F.2d at 539–40. The Fifth,[6] Sixth,[7] and Eleventh[8] Circuits have all concluded that in conflicts between the plan and the summary, the summary must control. Federal Express has cited no contrary authority. Even if they had,

---

**5.** The various requirements of § 1022 and the regulations are extremely long. The court is unwilling to burden this Order with a detailed recitation of the requirements and the page in the booklet where the requirement is met. Suffice it to say that the court finds as a matter of fact (by applying the provisions of the booklet to the legal requirements of the statute and the regulation) that the booklet qualifies as a "summary plan document."

**6.** *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir.1991).

**7.** *Edwards v. State Farm Mut. Auto Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988).

**8.** *McKnight v. Southern Life & Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985).

this court is bound by the decision in *McKnight* from the Eleventh Circuit.

Federal Express argues that the Plans must control any potential or alleged conflict concerning the plans and amounts that must be reimbursed. This argument is based on language in the reimbursement agreement that provides for repayment of all sums received from Federal Express "for which subrogation or reimbursement is allowed under the **Plans**." (emphasis added). Federal Express asserts that, because of this language in the agreement, Mrs. Thompson was put on notice that reimbursement was governed, not by the booklet that describes what benefits are to be repaid, but by the Plans themselves.

 This argument, though somewhat compelling, has one serious flaw—the booklet that summarizes the Plans requires a different conclusion. The court cannot rely on the literal language of the agreement in this instance and find that the Plans themselves control over contrary language in the SPD. Public policy, as defined by the courts of this country and the Congress, dictates that summary plan documents control any discrepancy between the plans and the summary. For the reasons discussed below, the court finds that the same rule should apply to contracts that regulate the rights and obligations of the parties.

The booklet is the appropriate source of information for Plan participants with questions about what is covered and how the Plans are administered. If there is any conflict between the Plan documents and the SPD booklet, the booklet will always control. *See Alday v. Container Corp. of America,* 906 F.2d 660, 666 (11th Cir.1990) *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907 (2d Cir.1990).

The statute requires that the SPD be comprehensive and accurate and relate information in a way that the average plan participant can understand. 29 U.S.C. § 1022(a)(1); *see also Pierce v. Security Trust Life Ins. Co.,* 979 F.2d 23, 26 (4th Cir.1992). To require a participant to return to the complex and often confusing

language of the Plans themselves, instead of the SPD, frustrates the purpose Congress intended the SPD to perform—to be an accurate and understandable summary of the plans' administration. The benefit provider cannot disclaim reliance on the SPD provided to the covered employees. Any attempt to assert that the Plans control over provisions found in the booklet is ineffective. *McKnight,* 758 F.2d at 1570; *Pierce,* 979 F.2d at 28. Clearly, the booklet must contain the controlling language in this case.

A similar rule must apply to other documents that seek to regulate the obligations of participants in the benefit plan. When a document refers to coverage by the Plans, what is described by that document are the materials contained in the plan summary—not what is in the Plan documents themselves. To hold otherwise would clearly frustrate the Congressional purpose of requiring the SPD. A covered employee is entitled to reasonably rely on the summary of the Plans provided by his employer. *McKnight,* 758 F.2d at 1570. Constantly requiring participants to refer to the Plans themselves instead of the "accurate and comprehensive" summary frustrates the purpose of the summary, confuses the reasonable reliance of the participant, and serves none of the public policies contained in ERISA. As the Fifth Circuit said

> Under Continental's proposed rule the summary would not need to be accurate of comprehensive—if there were an ambiguity in the summary or an inaccuracy that put the summary in conflict with the policy, that ambiguity or inaccuracy would be cured by the policy itself. The result would be that before a participant in the Plan could make any use of the summary, she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate, and not in conflict with the policy. Of course, if a participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all.

*Hansen,* 940 F.2d at 981–82. The booklet controls what benefits are to be reimbursed

to the Plans in accordance with the reimbursement agreement.

In order to avail herself of the fact that the summary controls what is to be reimbursed, Mrs. Thompson[9] must show that she relied on the provisions of the summary. *McKnight*, 758 F.2d at 1570; *Pierce*, at 29–30. Her deposition testimony indicates that she does not now recall whether she read the disability provisions contained in the SPD. Federal Express asserts that her lapse in memory precludes any finding that she did in fact rely on the representations of the booklet when she signed the reimbursement agreement.

The parties have stipulated that the court may rule on this matter as if after a full trial. The court may, therefore, draw what inferences are available from the evidence in the record.

Federal Express does not dispute that Mrs. Thompson relied heavily on her lawyers in her dealings with Federal Express concerning the reimbursement agreement. In fact, her use of, and dependence on, her lawyer forms the cornerstone of the argument Federal Express makes to rebut her claim of duress.

The letter from Attorney Joel Wooten to Federal Express of May 30, 1989, expresses the opinion that Federal Express is entitled to reimbursement of "medical expenses paid by [Federal Express]" in accordance with "page 3–5 and pages 2–39 and 40." (Appendix 1 to Defendant's Brief). These are the pages dealing with the subrogation or reimbursement rights of Federal Express for disability benefits and health care benefits. (Exhibit "I" to Plaintiff's Amended Complaint; Admitted in Paragraph 29 of Defendant's Answer to Plaintiff's Amended Complaint). The language in the letter expressly refers to medical expenses.

This letter was rejected by Federal Express, which insisted that its form agreement be executed. (Appendix 2 to Defendant's Brief). However, that rejection is immaterial to the court's use of the letter. The court relies on the letter from Mr. Wooten to show that Mrs. Thompson's attorneys read the booklet to require Mr. Thompson to reimburse Federal Express only for medical expenses Federal Express paid.

The evidence is uncontradicted that Mrs. Thompson relied on her attorneys to advise her regarding the reimbursement agreement Federal Express insisted someone sign. (Deposition of Donna Thompson at 84). Her attorneys interpreted the plain language of the plan summary to require reimbursement of medical expenses and medical expenses only. Mrs. Thompson was asked at her deposition whether her attorneys explained the meaning of the reimbursement agreement to her. She replied that they did. (Deposition of Donna Thompson at 83–84). In the court's opinion, it is reasonable to infer that Mrs. Thompson's attorneys advised her of their reading of the requirements of the plan as explained in the summary booklet and that she relied on that explanation.

The court does not find Federal Express's argument to the contrary persuasive. Mrs. Thompson testified that she did not recall reading the plan summary regarding disability benefits. She also testified that during the months when these negotiations between her lawyers and Federal Express were occurring, she was not very cognizant of anything other than the condition of her husband. (Deposition of Donna Thompson at 42–44). Her lapse in memory at that point is understandable and excusable. This lapse does not impair her credibility regarding other matters. Any reasonable person would likely react similarly faced with the serious injury to one's spouse. The mere fact that she does not now, two years later, recall whether she read a specific page in the employee benefit booklet does not support the argument that she did not reasonably rely on the booklet. It is clear that her attorneys read the book-

---

9. Since Mrs. Thompson executed the agreement it is her reliance on the summary document that must control. Furthermore, she, as her husband's legal representative, ratified her earlier action in executing the agreement. What she knew or believed at the time she signed the reimbursement agreement must control.

let. It is also clear that they thought the booklet only required reimbursement of any medical expenses paid by Federal Express on behalf of its employee, Mr. Thompson. The court finds, therefore, that Mrs. Thompson, acting on the advice and consent of her lawyers, reasonably relied on the plan summary booklet that only medical expenses were to be reimbursed to Federal Express if there was a recovery from the third party tortfeasor.

The court will exclude from Federal Express's recovery any amount paid as disability benefits. Under the stipulation of the parties, that amount is $15,730.87.

### B. Deduction in Federal Express's Recovery for Attorneys' Fees

Mr. Thompson also argues that Federal Express should bear their proportionate share of the cost of the recovery against the third party tortfeasor. In other words, Federal Express should be required to assume some of the cost of obtaining the recovery had by the Thompsons.

Unfortunately, this argument is meritless. The case cited by Plaintiff at oral argument, *Bell v. Federal Kemper Ins. Co.*, 693 F.Supp. 446 (S.D.W.Va.1988), does not help their position. That court held that the insurance company, with a right to reimbursement or subrogation, should bear its proportionate cost of the litigation and recovery, *"absent an agreement to the contrary."* 693 F.Supp. at 451. In the case before the court, there is an agreement to the contrary. The reimbursement agreement specifically provides that Federal Express is entitled to the lesser of "(i) amounts recovered, less legal expenses incurred as a result of the recovery, or (ii) amounts of such benefits received." The agreement is worded to avoid financial prejudice to the plan benefit recipient who recovers less than his actual expenses. By the literal wording of the agreement, the plans are entitled to receive as reimburse-ment either everything the participant receives in recovery from the responsible party, minus legal expenses, or the amount the plan paid to the benefit recipient, whichever is less. Any other reading is simply unreasonable.

The court agrees that Mr. Thompson did not receive everything he hoped for in his compromise settlement with the third party tortfeasor. That is the nature of compromise and settlement of claims. In any case, he did receive more than the amount Federal Express had advanced to pay his medical expenses, amount of medical expenses paid by them, without allowance for attorney's fees. This complies with the express, literal language of the agreement that was executed by Mrs. Thompson on her husband's behalf. Any other reading is a tortured and inappropriate interpretation of the clear meaning of the agreement.

## CONCLUSION

In accordance with the previous discussion, analysis and conclusions of this court, it is hereby ORDERED, ADJUDGED, AND DECREED that:

Federal Express shall receive $423,070 as reimbursement of medical expenses paid on behalf of Gary Wayne Thompson in accordance with this court's reasoning and the stipulation of the parties.

Federal Express shall not receive reimbursement for disability benefits paid by it to Gary Wayne Thompson.[10]

A copy of this order is to be served on the Probate Court of Coweta County. That Court is requested to release the funds currently held by it in accordance with its order of July 31, 1991.

The parties are directed to appear and show cause why the claim of Defendant Federal Express for attorney's fees should not be granted. A hearing on this issue shall be held at the U.S. Courthouse in

---

10. The court elects not to address the future benefits issue briefed by the parties. It was not plead by Plaintiff until a last minute attempt to amend their complaint after the case had already been submitted to the court for decision. Furthermore, Plaintiff has administrative reme-dies within the provisions of the benefit plans for challenging adverse decisions, if necessary. Plaintiff must exhaust those, or show that such action would be futile, before this court would have jurisdiction over the controversy.

Macon, Georgia, the 6th day of January, 1993, at 2:00 p.m., before this court. A supplemental briefing schedule shall be ordered at that hearing, if necessary.

SO ORDERED.