Basil and Marlene **SHELL**, Plaintiffs,

v.

**AMALGAMATED COTTON GARMENT and Allied Industries Fund and Amalgamated Life Insurance**, Defendants.

No. 3–91–526.

United States District Court,
D. Minnesota,
Third Division.

March 16, 1994.

Frank J. Rajkowski, Donohue Rajkowski, Ltd., St. Cloud, MN, for plaintiffs.

Christopher A. Curry, Linda J. Soranno, Mark P. Wine, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Before the Court are (1) Plaintiffs Basil Shell and Marlene Shell's (collectively, the "Shells") Motion for Partial Summary Judgment, and (2) defendants Amalgamated Cotton Garment and Allied Industries Fund (the "Fund") and Amalgamated Life Insurance's ("ALI") Motion for Summary Judgment. The two motions are cross-motions for summary judgment; resolving them will comprise a final determination of the issues in dispute.[1]

### Background

This matter was before the Court in September of 1992 on the Shells' Motion for Summary Judgment. The Court assumes familiarity with the factual background of the dispute; hence, except as set forth below, none will be provided.

The Fund provides health and hospital benefits to participants and their dependents according to a schedule contained in the plan document setting forth the terms and conditions of the benefit plan (the "Plan Document"). The Plan Document contains a subrogation provision which provides:

> When benefits are paid to or for an Employee or a Dependent under the terms of this plan, the Fund shall be subrogated to the right of recovery of such Employee or Dependent against any person or entity who is liable for the injury that necessitated the hospitalization or the medical or the surgical treatment for which the benefits were paid or the injury that necessitated disability payments. Such subrogation rights shall extend only to the recovery of the Fund of benefits it has paid for such hospitalization and treatment, and the Fund shall pay its share of fees and costs associated with such recovery.

Plan Document, § 7.5, Plfs' Exh. C. The Summary Plan Description ("Summary") for the Fund offers the following description of the Fund's subrogation rights:

---

1. Although the motions are captioned somewhat differently, it is clear from the parties' submissions to the Court that the issues presented therein are identical. In addition, counsel agreed at oral argument that resolution of their motions would terminate the litigation.

The Fund is entitled to recoup any payments it makes if you or your covered dependents recover damages through a lawsuit against a third party which is responsible for the illness or injury for which the Fund has paid benefits.

Summary, at 21, Curry Aff., Exh. B.

The Plan Document also contains a provision imbuing the Board of Trustees with the power to interpret the terms of the Plan Document:

The Board of Trustees shall have the exclusive right to interpret any and all of the provisions of this Plan and to determine any questions arising thereunder or in connection with administration of this Plan, including determining all questions of eligibility, classification status and rights of Employees and Dependents, the amount, manner and time of payment hereunder, all in a manner not inconsistent with the terms of the Plan; provided, however, that in the determination of any question requiring the exercise of discretion by the Board of Trustees such determination shall apply in a uniform and nondiscriminatory manner to Employees similarly situated. Any decision or action of the Board of Trustees shall be conclusive and binding on all Employees and all other interested persons.

Plan Document, § 9.11, Plfs Exh. C, at 30.

Subsequent to his automobile accident, Basil Shell incurred medical expenses in excess of $140,000. These expenses fell within the coverage provided by the Fund; as a result, the Shells submitted a claim for their payment. The Fund refused to pay any of those bills until the Shells executed an agreement granting the Fund a first priority lien on any amounts recovered from third-party tortfeasors; they refused and brought this action. Pursuant to the Court's September 28, 1992

Memorandum Opinion and Order ("1992 Order") granting the Shells' motion for partial summary judgment, the Fund was obligated to pay Basil Shell's medical bills according to the terms of the Plan Document and without first obtaining any first priority lien.[2]

On November 12, 1992 the Shells settled their tort claims—those of Basil Shell, Marlene Shell, and their daughter, Karma Shell—against third-party tortfeasors for $500,000. Counsel for ALI and the Fund was notified of the settlement by a letter dated November 13, 1992. Basil Shell executed the settlement documents (including releases of the third parties) on December 12, 1992; Marlene Shell executed the settlement documents on December 15, 1992.

Prior to November 12, 1992 the Fund had paid $13,348.84 in medical bills. Between that date and December 15, 1992, the Fund paid an additional $48,529.82 in medical bills.[3] Thereafter, the Fund paid an additional $27,-597.13; thus, the total amount of benefit payments made by the Fund is $89,475.79.

Incident to the settlement agreement and release agreements entered into between the Shells and the third-party tortfeasors, $63,-300 was deposited into an escrow account for contingent satisfaction of the Fund's right of recoupment, if any, under the Plan Document. The status of those monies is at issue in the parties' Cross–Motions for Summary Judgment.[4]

## Discussion

### I. Standard of Decision

■ Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that Rule:

[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

2. In the 1992 Order (Doc. No. 18), the Court held that ALI could not require the Shells to execute a subrogation agreement as a precondition to ALI paying Basil Shell's insurance claims.

3. This payment represented a portion of medical charges totalling $82,283.35; the Fund invalidated the remaining amount after auditing the hospital's charges.

4. In their memoranda and at oral argument, the Shells contend that the parties have agreed that the $63,300 currently in escrow represents the maximum amount ALI could recover in the exercise of its subrogation rights; ALI disagrees. Although the Court cannot discern the parties' intent in creating the escrow fund, its disposition of the parties' cross-motions renders that dispute immaterial.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Ordinarily, the court's task on a motion for summary judgment is not to weigh facts or evaluate the credibility of affidavits and other evidence. Rather, the Court need only determine whether the record, as identified by the parties, shows the existence of a real controversy over a material issue, such that the controversy must be resolved by the finder of fact at trial. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 733 (8th Cir.1987). In this case, however, the parties agree that the issues before the Court are ones of law, and not of fact; thus, the issue raised by the parties' cross-motions for summary judgment is not whether this dispute must proceed to trial, but which of the parties' positions prevails under the law as applied to the undisputed facts.

The questions raised by the parties' cross-motions for summary judgment are (1) does the subrogation clause give the Fund the right to reimbursement from the Shells' settlement, or does it bend to the "make whole" doctrine, and (2) if the Fund does have a right to reimbursement, what is the scope of that right?

## II. Application of the "Make Whole" Doctrine as a Limit on the Fund's Right to Reimbursement

The Fund contends that under the federal common law applied to ERISA-regulated plans, the plain language of the subrogation clause in section 7.5 of the Plan Document entitles it to reimbursement of payments it has made for Basil Shell's medical expenses; alternatively, the Fund contends that this Court must uphold the Board of Trustees' interpretation of section 7.5 as providing the Fund with that right.

The Shells respond that where, as here, a benefits plan does not contain language giving the plan a first priority for recovery of benefits paid, the plan is not entitled to reimbursement unless the injured party is "made whole" through settlement or other relief. Because their settlement with the third-party tortfeasors did not make them whole, the Shells continue, the Fund is not entitled to any reimbursement.

■ The Court concludes that under the facts of this case, the make whole doctrine does not bar the Fund from exercising its right to subrogation. In *Sanders v. Scheideler*, 816 F.Supp. 1338 (W.D.Wis.1993)—a case on which the Shells rely—the court stated: "The [make whole] doctrine would serve strictly as a rule to be applied only when a plan fails to *designate priority rules or provide its fiduciaries the discretion* necessary to construe the plan accordingly." *Id.* at 1347 (emphasis added); *see Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1298 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993); *Blue Cross/Blue Shield of Rhode Island v. Flam*, 509 N.W.2d 393 (Minn.Ct.App.1993). These decisions indicate that the make whole doctrine is a gap-filler, determining priority when a benefits plan neither addresses priority nor authorizes the trustees to determine priority by interpreting the terms of the plan. Following, where a plan specifically provides for priority *or* imbues the plan's fiduciaries with discretionary authority to construe the terms of the plan, the make whole doctrine is both unnecessary and inapplicable.[5] As set forth above, section 9.11 provides the Fund's Board of Trustees with discretionary authority to interpret the terms of the Plan Document.[6] Under the facts of this case, there-

---

5. Although the Shells exhibit a willingness to read only the first portion of the excerpt from *Sanders* (that relating to the absence of a priority provision), they cannot escape or ignore the second portion of the rule concerning the applicability of the make whole doctrine.

6. Section 9.11 provides, in pertinent part:

> The Board of Trustees shall have the exclusive right to interpret any and all of the provisions of this Plan and to determine any questions arising thereunder or in connection with ad-

fore, there are no gaps for the make whole doctrine to fill.

■ However, although section 9.11 renders the make whole doctrine inapplicable, the Board of Trustees's interpretation of the Plan Document is subject to judicial review. Where a plan's fiduciaries exercise their discretion in the interpretation of an ERISA-governed plan, the question becomes whether the Board of Trustee's interpretation was an abuse of its discretion; that is, was the interpretation "extraordinarily imprudent or extremely unreasonable."[7] *Cox v. Mid–America Dairymen, Inc.,* 965 F.2d 569, 572 (8th Cir.1992); *see Cutting,* 993 F.2d at 1295–96 ("abuse of discretion" and "arbitrary and capricious" are possibly synonymous terms for the deferential standard of review); *cf. Donatelli v. Home Ins. Co.,* 992 F.2d 763, 765 (8th Cir.1993) (where discretion is lacking, the district court's standard of review is de novo). Thus, the Court must determine whether the Board of Trustees' interpretation of section 7.5 as enabling the Fund to recoup from a beneficiary any payments the Fund pays on that beneficiary's injuries in cases where an employee is not made whole by a settlement, was an abuse of discretion.

■ In making the foregoing determination, the Court must consider whether the interpretation: (1) was consistent with the goals of the Fund, (2) rendered any language in the Plan Document meaningless or internally inconsistent, (3) conflicted with the substantive or procedural requirements of the ERISA statute, (4) interpreted the words at issue consistently, and (5) was contrary to the clear language of the Plan Document. *Finley v. Special Agents Mut. Ben. Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir.1992) (citing *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1188 (4th Cir.1989)); *see Cox,* 965 F.2d at 572

(factors identified in *Finley* are appropriate to abuse of discretion review).

■ Based upon a review of the aforementioned considerations, the Court is unable to conclude that the Board of Trustees abused its discretion in interpreting the Fund's right to reimbursement as it did. Although the Board of Trustees could have interpreted section 7.5 as including the make whole principle, the question here is not whether the Board of Trustees *could have* reached a different interpretation. Applying the *Finley* factors, then, the Court can discern nothing in the goals[8] of the Fund, the clear language of the Plan Document, or ERISA itself that made it an abuse of discretion to interpret section 7.5 as providing the Fund with a right to reimbursement of benefits paid to an employee who settles a third-party claim for less than the employee's claimed damages. Accordingly, the Shells are not entitled to summary judgment on the ground that the Fund had no right to reimbursement because the Shells were not "made whole."

### III. The Scope of the Fund's Right to Reimbursement

■ That the Court has sustained the Board of Trustees' interpretation of section 7.5 as it regards the application of the make whole doctrine does not mean that the Fund is entitled to recover all of the payments it made on behalf of Basil Shell. Separately reviewable is the Board of Trustees' interpretation that the Fund is entitled to reimbursement for, i.e., it may "recoup," all benefits paid on behalf of Basil Shell, including any expense claims it paid after the Shells settled their claims against the third-party tortfeasors.

As noted above, section 7.5 provides:
the Fund shall be subrogated to the right of recovery of such employee or dependent

---

ministration of this Plan, including determining all questions of eligibility. . . .
Plfs' Exh. C, at 30.

**7.** The Shells contend that the Fund has never "interpreted" section 7.5 of the Plan Documents; hence, this Court cannot evaluate the reasonableness of that interpretation. (Reply Mem. in Supp. Summ. J., at 6.) Given the pointed nature of this dispute and the Fund's consistent position

throughout this litigation, the Shells' contention must be rejected.

**8.** "The purpose of this Plan is to provide to employees and their dependents comprehensive medical care coverage in the event of illness or bodily injury. This Plan is maintained for the exclusive benefit of all eligible employees and dependents." Plan Document, § 1.1.

against any person or entity who is liable for the injury that necessitated the hospitalization or the medical or the surgical treatment for which the benefits *were* paid or the injury that necessitated disability payments. Such subrogation rights shall extend only to the recovery of the Fund of benefits it *has* paid for such hospitalization and treatment. . . .

Plfs' Exh. C, at 30. The plain language of section 7.5 provides that the Fund becomes subrogated to a covered employee's right of recovery on a dollar-for-dollar basis; that is, for each dollar the Fund pays on claims submitted by a participant or dependent, the Fund becomes subrogated to a dollar of any monies that person recovers from third parties. However, the Fund is not subrogated to any future claims or to claims that have been submitted to it, but not yet paid.[9] Section 7.5 also establishes that the Fund is subrogated only to an employee's "right of recovery."

Section 9.11 of the Plan Document provides the Court with all of the tools necessary to determine that the Board of Trust-

ees' interpretation of the scope of the Fund's reimbursement right cannot stand. Section 9.11 requires the Board of Trustees' interpretations to be made "in a manner not inconsistent with the terms of the Plan." If section 7.5 gives rise to a right of subrogation only after a claim has been paid and permits the Fund to be subrogated only to a participant or dependent's right of recovery, it seems plain that when an employee terminates or surrenders his right to recovery in connection with a settlement, post-settlement payments by the Fund cannot provide it with a right of reimbursement, since the Fund simply has nothing to which it could become subrogated.[10] Accordingly, interpreting section 7.5 as providing a right to reimbursement of benefit payments made after an employee settles his third-party claims is an interpretation inconsistent with the "terms of the plan."[11] The Fund, therefore, is entitled to reimbursement only of the amount of any claims it paid *prior to* the date on which the participant or dependent settles his claims against third-party tortfeasors and releases them from liability.[12]

9. The provision in the Summary stating that the Fund has a right of "recoupment" does not limit the Fund's reimbursement right to benefits that *have been* paid. *Compare* Plan Document, § 7.5 ("subrogation rights shall extend only to the recovery by the Fund of the benefits *it has paid* for such hospitalization and treatment"), *and* Summary, at 21 ("[t]he Fund is entitled to recoup any payments it makes if you or your covered dependents recover any damages through a lawsuit against a third party"). However, since the Summary states that "[i]n cases where an official interpretation is needed, the Plan documents will always be used," *id.* at 4, the more limited language in § 7.5 controls this Court's review of the Board of Trustees' interpretation. *See Sturges v. Hy–Vee Employee Ben. Plan & Trust,* 991 F.2d 479, 480–81 (8th Cir.1993).

10. This determination is consistent with the Court's discussion in the 1992 Order: *"If* the participant or dependent recovers damages through a lawsuit or settlement, *then* [the Fund] may exercise its right of subrogation to recoup the payments it made on behalf of the participant or dependent." 1992 Order, at 11. Like the language of § 7.5 itself, the Court's discussion focuses on the Fund's right to recoup only those payments it prior to the settlement of a participant's or dependent's claims against a third party.

This determination is also consistent with the documents the Fund offers to support its inter-

pretation of § 7.5. Exhibit B to the Affidavit of Indani Mazumder is an October 26, 1990 letter from ALI to Basil Shell, discussing the processing of Shell's insurance claims. The letter provides that "[u]nder subrogation, the Fund can be reimbursed on any Accident & Health claims including disability, it *has paid* on your behalf" (emphasis added). The letter further provides:

Once a settlement is made with the insurance company, contact this office regarding the amount owed the Fund.

If you have an attorney working on your case, please give him/her a copy of this policy and assignment. Once a settlement has been made on your behalf, your attorney must contact this office regarding the amount owed the Fund.

Mazumder Aff., Exh. C.

The letter establishes that the Fund is entitled to reimbursement only after it has paid a claim. More importantly, its statements concerning post-settlement reimbursement imply that the amount that a participant or dependent owes the Fund is finally determined as of the date of the settlement.

11. Because it is inconsistent with the plain language of the Plan Document, the interpretation is also an abuse of discretion under *Finley.*

12. The Fund relies on language in the 1992 Opinion that the subrogation clause entitles the Fund to *"recoup* the payments it makes on behalf

The question thus becomes, when did the Shells' settlement become effective? The Shells contend that (a) Minnesota law governs when the settlement became effective and (b) under Minnesota law the settlement agreement became effective on November 12, 1992 when they agreed to accept the offer of settlement. The Fund contends that (a) the effective date of the settlement must be determined under federal common law and (b) under that law, the settlement became effective only on December 15, 1992, the date on which both Basil Shell and Marlene Shell had executed full and final releases and settlement agreements.[13]

■■■ Initially, the Court agrees with the Fund and ALI that the effective date of the settlement between the Shells and the third-party tortfeasors is a question of federal common law; the answer to that question directly affects the Fund's rights, and the Shells' obligations, under the Plan Document. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). The Shells have not offered the Court any support for distinguishing this case from ERISA decisions applying federal common law principles to questions of contract law, *see e.g., Haeffele v. Hercules, Inc.*, 662 F.Supp. 1302, 1304 (D.Del.1987), *rev'd on other grounds*, 839 F.2d 952 (3d Cir.1988), and the Court is unable to find any reason to exempt the contract issue in this case from application of federal common law.[14] *But see Thompson v. Federal Express Corp.*, 809 F.Supp. 950, 954 (M.D.Ga.1992).

■■■ Upon examining general principles of contract law and decisions emanating from federal courts, the Court concludes that as a matter of federal common law the settlement was effective whenever the Shells

agreed to settle and compromise their claims, whether that agreement was oral or in writing. *First,* the Defendants do not cite, nor could the Court find, any authority for the proposition that, as a matter of federal common law, a writing is required to make a settlement effective. Indeed, several courts have specifically held that oral agreements to settle litigation are enforceable. *See e.g., Alexander v. Industries of the Blind, Inc.*, 901 F.2d 40, 41 (4th Cir.1990) (agreement to settle Title VII case); *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir.1986) (same); *Boettcher Sewer & Excavat. Co. v. Midwest Operating Engineers Welfare Fund*, 803 F.Supp. 1420, 1426 (N.D.Ind.1991) (agreement to settle ERISA case); *Wyche v. Procter & Gamble Co.*, 772 F.Supp. 982, 983 (S.D.Ohio 1990) (agreement to settle Title VII case). *Second,* general principles of contract law provide that a contract is formed when there is "manifestation of mutual assent" (usually communication of a valid offer and acceptance of same), which may be made "wholly or partly by written or spoken words." *Restatement (Second) of Contracts* §§ 1, 18, 22 (1981); *see Jallen v. Agre*, 264 Minn. 369, 373, 119 N.W.2d 739, 743 (1963). The Defendants do not contend that the November 12, 1992 settlement was invalid as lacking mutual assent; thus, the manifestation of mutual assent necessary to make the settlement valid was not dependent on a writing. *Third,* the authorities the Defendants cite in support of their position concern only the effect of a settlement on a participant's subsequent claim that he was not made whole, *see e.g., Thompson,* 809 F.Supp. at 954; thus, they are inapposite to the issue before the Court. Accordingly, as the Defendants apparently concede that the Shells and third-party tortfeasors manifested mutu-

---

of the participant *if* the participant recovers any damages in a lawsuit or settlement." 1992 Opinion at 9–10. Although the Court has already held that the Fund has a right to reimbursement, nothing in the 1992 Opinion can be read as holding that the Fund has a right to reimbursement of payments made after the Shells settled their third-party tort claims.

13. The difference in the effective date is important, as the Fund had paid $13,348.84 in benefits prior to November 12, 1992, but had paid over $61,000 in benefits prior to December 15, 1992.

14. Federal courts may look to state law when creating federal common law rules under ERISA, as long as the state law is not inconsistent with statute itself and the policies underlying it. *Fox Valley & Vic. Const. Workers Pension Fund v. Brown*, 897 F.2d 275, 281 (7th Cir.1990) (en banc), *cert. denied*, 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990); *Simmons v. Diamond Shamrock Chem. Co.*, 658 F.Supp. 1053, 1056 (E.D.Mo.1987), *aff'd*, 844 F.2d 517 (8th Cir. 1988).

al assent to settle their dispute on November 12, 1992—they have not asserted otherwise [15] —it is immaterial that writings memorializing the settlement were not executed until December of 1992.[16]

Having determined that a writing was not required to create a binding settlement under federal common law, the Court concludes that the November 12, 1992 agreement was a valid settlement; thus, the releases of the third party tortfeasors which occurred pursuant thereto were also effective on November 12, 1992. Since the releases had the effect of extinguishing the Shells' right of recovery against those third parties, the Fund no longer had anything to be subrogated to and did not, therefore, acquire a right to be reimbursed for any subsequent benefit payments it made on Basil Shell's behalf.[17]

It is undisputed that as of November 12, 1992, the Fund had paid a total of $13,348.84 in benefit claims. The Fund, therefore, is entitled to reimbursement of that amount.

The Shells contend that any recovery must be reduced by one-third to reflect the language in section 7.5 that "the Fund shall pay its share of fees and costs associated with such recovery"; the Fund appears to concede that some sort of pro rata reduction in the amount reimbursed is appropriate. *See* Mazumder Aff., ¶ 6. Accordingly, the Court will direct the parties to *jointly* submit a proposed figure representing the proper amount of the reduction.[18]

### Conclusion

Based upon the foregoing, and the records, files, and proceedings herein, including the briefs and arguments of counsel, **IT IS ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment (Doc. No. 23) is **GRANTED** as to their claim that the Defendants are not entitled to reimbursement of all of the claims they paid on behalf of plaintiff Basil Shell, and is, in all other respects, **DENIED;**

2. Defendants' Motion for Summary Judgment (Doc. No. 28) is **GRANTED** to the extent that the Fund shall be reimbursed for the benefit claims it paid on or before November 12, 1992, and is, in all other respects, **DENIED;**

3. The Defendants shall have and recover from the Plaintiffs the sum of thirteen thousand three hundred forty-eight dollars and

**15.** The Defendants have submitted as an exhibit in support of their motion a December 3, 1992 letter from counsel for the third party tortfeasors to counsel for Defendants. Curry Aff., Exh. E. That letter reveals that counsel for Defendants (a) knew that the Shells had reached a settlement with the third party tortfeasors and (b) had agreed that settlement checks could be provided to the Shells without the Fund as a payee. As this letter was sent almost two weeks before the Shells executed the settlement documents, it rebuts the Defendants' assertion that the settlement could not have been effective until the papers were signed.

**16.** The same result would occur if Minnesota law controlled the question. Under Minnesota law, a compromise settlement of a lawsuit is contractual in nature. *Jallen v. Agre,* 264 Minn. 369, 373, 119 N.W.2d 739, 743 (1963). Therefore, a settlement agreement is valid and binding when there is a definite offer and acceptance thereof, thereby resulting in a meeting of the minds on the contract of settlement. *See Jallen, id.* at 373, 119 N.W.2d at 743. Minnesota law does not require that the parties sign a writing in order for there to be offer and acceptance sufficient to give rise to a binding contract for settlement. *See e.g., Rosenberg v. Townsend, Rosenberg & Young,* 376 N.W.2d 434, 437 (Minn.Ct.App.1985) (settlement valid even though plaintiff never executed settlement agreement).

**17.** Likewise, the Fund is not entitled to claim a right of "equitable subrogation." As is described in *Travitz v. Northeast Dept. of ILGWU H. & W. Fund,* 818 F.Supp. 761 (M.D.Pa.1993), *aff'd* 13 F.3d 704 (3d Cir.1994)—the case upon which the Fund relies—a benefit fund would be entitled to an equitable remedy only if the plan had a reasonable expectation of being reimbursed, as for example, if the plan paid benefits by mistake, or if the employee refused to reimburse the plan for payments reimbursable under some subrogation provision. *See id.* at 769 Here, the Fund has no reasonable expectation of being reimbursed for any payments other than the $13,348.84; thus, it has no right to the exercise of this Court's equitable powers. Moreover, the Fund has never asserted a counterclaim against the Shells; as a result, the Court would be unable to afford the Fund the relief it seeks.

**18.** Relatedly, the Fund requests that it be awarded the costs and attorney's fees incurred in gaining reimbursement. Given the portion of section 7.5 set forth above, the Court doubts whether the Fund is entitled to any award for fees and costs. Determining that issue, however, will await further submissions by the parties.

eighty-four cents ($13,348.84), exclusive of interest and costs, if any, to which the Defendants may entitled, less any proper reductions required under the terms of the Plan Document; and

4. The parties shall file and serve, within ten (10) days of the date of this Order, (a) a *joint* proposal for the appropriate amount of a reduction in the amount to be recovered by the Defendants under section 7.5 of the Plan Document (in the absence of a joint proposal, counsel should submit position papers on this issue), and (b) position papers on the Fund's right to recover any portion of its costs, including attorney's fees.