**TRIDENT REGIONAL HEALTH SYS.,**
**f/k/a Trident Regional Medical**
**Center, Plaintiff,**

v.

**Candace L. POLIN, Defendant**
**and Third–Party Plaintiff,**

v.

**LIFE CYCLE ENG'G, Third–**
**Party Defendant.**

**C/A No. 2:96–596–21.**

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 17, 1996.

Karen S. Roper, Charleston, SC, for plaintiff.

Jack D. Cordray and George J. Kefalos, Charleston, SC, for Defendant and Third–Party Plaintiff.

Richard S. Rosen, Charleston, SC, for Third–Party Defendant.

## ORDER

TRAXLER, District Judge.

Plaintiff Trident Regional Health System ("Trident") instituted an assumpsit action in state court against Defendant—Third–Party Plaintiff Candace Polin ("Polin"), alleging that Polin owed $32,638.45 for medical services rendered, plus interest, attorney's fees, and costs. Polin admitted that she incurred the expenses Trident claimed, but denied liability, and filed a third-party action against Third–Party Defendant Life Cycle Engineering ("Life Cycle"), asserting that Life Cycle was liable for the medical services owed to Trident. Pursuant to 28 U.S.C.A. § 1441 (West 1994) and 29 U.S.C.A. § 1132(e)(1) (West Supp.1996), Life Cycle removed the actions to federal district court and subsequently moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). According to Life Cycle, Polin failed to comply with the terms of her employee health benefits plan, a plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1996) (ERISA), so Life Cycle is not required to pay Polin's medical expenses until Polin recognizes Life Cycle's subrogation rights. Specifically, Life Cycle asserts that because Polin refused to comply with the

subrogation terms of the Plan, it need not make any payments respecting her medical expenses until she has fulfilled her obligations under the Plan; thus, Life Cycle does not deny liability for Polin's medical expenses, but argues that it need not disburse funds until Polin signs the subrogation agreement. Polin opposes Life Cycle's motion for summary judgment, but does not assert that any material facts are disputed. Rather, Polin contends that Life Cycle cannot assert a breach of the subrogation terms of the Plan because Life Cycle has not paid any of her medical expenses. Concluding that Life Cycle need not yet reimburse Polin for her medical expenses and may enforce its subrogation rights prior to complete satisfaction of her medical expenses, the court grants Life Cycle's motion for summary judgment.[1]

## I.

The material facts are neither disputed nor complicated. At all material times, Polin was an employee of Life Cycle, and in this capacity, participated as a "covered person" in an ERISA welfare plan ("Plan") that provides health insurance coverage. Life Cycle was both Plan fiduciary and administrator. In promulgating and implementing the Plan, Life Cycle reserved to itself "full discretionary authority to interpret and apply all Plan provisions, including, but not limited to, all issues concerning eligibility for and determination of benefits." (Plan at 1). Thus, Life Cycle is the interpreter of the Plan's provisions.

While traveling in an automobile driven by Kari Antley ("Antley"), Polin was injured when Antley collided with another vehicle. Consequently, Polin engaged Florida attorney Scott Seifert ("Seifert") to institute suit against Antley and Antley's insurance provider, Nationwide Insurance Company ("Nationwide"). Polin settled her suit with Antley and Nationwide: Polin released Antley from liability to herself and Life Cycle for $25,000.

Conspicuously, Polin did not notify Life Cycle of her suit against Antley and Nationwide, nor did she obtain permission from Life

---

1. No hearing on this motion is warranted. *See* District of South Carolina Local Rule 12.08.

Cycle to settle her suit, obligations imposed on her by the Plan. Specifically, the Plan provides in pertinent part:

> The Covered Person shall notify the Plan of the existence of any claim that the covered person may have against any negligent person or organization.... The Covered Person agrees to not settle any claim that they [sic] may have, or enter into any compromise, or accept any settlement of any claim for which the Plan has a subrogation right, or a right to recover, without prior approval by the Plan.

(*Id.* at 62). Thus, Polin's instituting suit against Antley and Nationwide and settling that suit without prior approval from Life Cycle breached the express provisions of the Plan.

Having sued and settled in violation of the Plan, Polin then sought benefits under the Plan from Life Cycle because the $25,000 was insufficient to satisfy all of her medical expenses. Despite seeking benefits, Polin refused to sign an instrument that protected the Plan's subrogation rights—hardly surprising since she settled her suit with Antley and Nationwide without permission from the Plan administrators, thereby prejudicing the Plan's rights. Similarly, Polin refused to execute an instrument requiring her to apply the $25,000 settlement to repay the Plan for any expenses the Plan would incur on her behalf. Polin refused to sign these instruments even though the Plan affirmatively imposed this duty:

> It is further agreed that the Covered Person will sign a written agreement to repay the Plan in full out of any monies that the covered person receives from a negligent person or organization. If the Covered Person fails to sign such an agreement, the Plan reserves the right to withhold payment of the Covered Person's claims, which relate to the negligence of another person or organization, until such time as the Covered Person signs the agreement to repay.

(*Id.*). Had Polin complied with the terms of the Plan, Life Cycle would have paid the benefits, and in the event Polin was aggrieved, she could have appealed any denial of benefits and sought administrative remedies as provided for in the Plan. (*Id.* at 70–71).

Because of Polin's breaches and recalcitrance, Life Cycle refused to pay any benefits in accordance with its interpretation of the Plan. In refusing to disburse funds to Polin, Life Cycle relies on the subrogation provision in the Plan, which provides in pertinent part:

> In the event that this Plan pays benefits for the expenses of a Covered Person, and those expenses were due to the negligence of a third party, the Plan shall be subrogated to all of the Covered Person's rights of recovery of those benefits against any person or organization. This means that if the Covered Person receives any monies from a negligent Person or organization, the Plan is entitled to recover its expenses from the negligent person or organization. The Plan is entitled to pro-tanto subrogation.... The Covered person shall cooperate with the Plan and do whatever is necessary to secure the Plan's subrogation, or right of recovery rights. This includes providing any information requested by the Plan.

(*Id.*). According to Life Cycle, Polin materially breached the subrogation provisions of the Plan and is thus precluded from recovering any benefits under the Plan, even though Life Cycle has not paid any benefits under the Plan.

## II.

Federal Rule of Civil Procedure 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery[,] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To prevail on its motion for summary judgment, Life Cycle must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). In determining if a genuine issue of

material fact has been raised, the court must construe all facts and reasonable inferences in favor of Polin. *See id.* at 255, 106 S.Ct. at 2513–14. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," the court must grant summary judgment in that party's favor. *Id.* at 252, 106 S.Ct. at 2512. Polin " 'cannot create a genuine issue of fact through mere speculation or the building of one inference upon another.' " *See Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1120 (4th Cir.1995) (quoting *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985)). To survive Life Cycle's motion for summary judgment, Polin may not rest on her pleadings, but must establish that specific, material facts exist that give rise to a genuine issue. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. In satisfying this burden, the *Anderson* Court explained, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. In this regard, "[s]ummary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become 'entrenched in a frivolous and costly trial.' " *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.,* 843 F.Supp. 1027, 1035 (D.S.C.1993) (quoting *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987)), *aff'd,* 46 F.3d 1125 (4th Cir.1995) (unpublished) (per curiam) (affirming summarily the reasoning of the district court). Guided by this procedural standard, the court examines the parties' contentions.

■ As a comprehensive statutory scheme, ERISA governs employee pension and welfare-benefits plans. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985). Under ERISA, a welfare-benefits plan is a plan that provides to employees "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death." 29 U.S.C.A. § 1002(1) (West 1985). While ERISA establishes procedural safeguards and standards regarding welfare-benefits plans, it does not govern the substantive content of such plans.

*See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896–97, 77 L.Ed.2d 490 (1983). Equally, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995). Material for purposes of this suit, ERISA provides that plan "participants," "beneficiaries," or "fiduciaries," may institute civil proceedings to enforce the terms of a welfare-benefits plan. *See* 29 U.S.C.A. § 1132(a)(3) (West 1985). Thus, as a plan participant, Polin may institute suit "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." *See id.* § 1132(a)(1)(B) (West 1985). As the administrator of its own plan, Life Cycle qualifies as a fiduciary, *see id.* § 1002(21)(A) (West 1985), but not as a participant or beneficiary, *see id.* § 1002(7), (8). To prevail in this suit, Life Cycle must prove that Polin breached a provision of ERISA or the Plan. *See Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 369 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 300, 133 L.Ed.2d 205 (1995). To resolve this issue, the court must first address Life Cycle's interpretation of the Plan and then determine if that determination can be upheld.

A.

■ Life Cycle posits that the plain language of the Plan does not require that Polin's expenses be satisfied prior to enforcing the subrogation provision. Conversely, Polin posits that Life Cycle is not entitled to subrogation because it has not disbursed any payments to her. Polin, therefore, seeks application of a "make whole" rule, namely requiring that a plan participant's expenses be fully satisfied prior to the participant reimbursing the plan. In advancing this position, Polin relies on terribly generic propositions of South Carolina subrogation

jurisprudence, but such precepts do not support her position.

First, ERISA provides that "[e]xcept as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all state law insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C.A. § 1144(a) (West 1985).[2] In analyzing the term "relates to," the Supreme Court has instructed that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan," *Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900, and the hallmark for resolving this inquiry hinges on Congress's intent in enacting ERISA, *see Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). To determine congressional intent for purposes of analyzing "relates to," the Court has explained that the inquiry must "go beyond the unhelpful test" of the statute and "look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* —— U.S. ——, ——, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995). In enacting ERISA, the *New York State Conference* Court explained that Congress intended that employee welfare plans and plan sponsors be subjected to a uniform body of employee benefits law. *See id.* To achieve this uniformity, Congress enacted ERISA to minimize the administrative and fiscal burden of plan sponsors of complying with conflicting directives among states or between states and the federal government, thereby preventing potential conflicts in substantive employee benefits law. *See id.* Consistent with the thrust of preemption, the ERISA preemption clause avoids multiplicity of regulation to ensure a national, uniform regime of employee welfare plans. *See id.* at ——–——, 115 S.Ct. at 1677–78. Thus, ERISA largely preempts

state law, and this preemption creates as an area of exclusive federal concern the subject of every state law that relates to an employee benefit plan governed by ERISA, and the concomitant result of this preemption is to ensure uniform application of employee welfare plans. *See FMC Corp. v. Holliday,* 498 U.S. 52, 57–58, 111 S.Ct. 403, 407–08, 112 L.Ed.2d 356 (1990). Applying these preemption principles, in *FMC Corp.,* the Supreme Court concluded that subrogation laws "relate to" employee welfare plans and thus are preempted by ERISA. *See id.* at 58–60, 111 S.Ct. at 407–09. Injecting state law, therefore, into ERISA's comprehensive scheme for tailoring uniformity defeats the purpose of the statute's enactment. Thus, South Carolina subrogation law is of no moment in resolving this controversy because it is preempted.

 State law failing to provide a remedy, the court must examine the propriety of fashioning a rule of federal common law. In this regard, while the Court has instructed the inferior federal courts to create federal common law under ERISA as a gap-filling measure, "[t]he authority of courts to develop a 'federal common law' under ERISA . . . is not the authority to revise the text of the statute." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 258–60, 113 S.Ct. 2063, 2070, 124 L.Ed.2d 161 (1993). Analogyzing from this precept, federal courts do not rewrite the unambiguous terms of an ERISA plan, and the courts, therefore, have declined to fashion just such a federal common law rule under like circumstances. *See Ryan by Capria–Ryan v. Federal Express Corp.,* 78 F.3d 123, 126 (3d Cir.1996) (holding that a subrogation provision in an ERISA plan mandating that an plan participant repay all money received in settlement from a third party does not require creation of a federal common law rule); *Blackburn v. Becker,* 933 F.Supp. 724, 728–30 (N.D.Ill.1996) (holding that the plain language of an ERISA subrogation provision providing that a participant reimburse the employer for all monies re-

---

**2.** The "saver," *see* 29 U.S.C.A. § 1144(b)(2)(A) (West 1985), and "deemer," *see id.* § 1144(b)(2)(B) (West 1985), clauses are not implicated by this suit. The saver clause is an exception to the preemption clause for state laws

regulating insurance, while the deemer clause is an exception to the saver exception that prohibits states from deeming employee benefits plans to be insurance companies.

ceived from a third party overrides a contrary federal common law rule respecting recovery of attorney's fees); *Cutting v. Jerome Foods,* 820 F.Supp. 1146, 1151–52 (W.D.Wis.1991) (concluding that an ERISA plan participant need not first have her expenses satisfied before the plan administrator could enforce its subrogation rights because the unambiguous language of the plan permitted this interpretation), *aff'd,* 993 F.2d 1293 (7th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993). Moreover, creating such a federal common law rule would violate the principle that ERISA does not govern the substance of employee welfare plans. Accordingly, the court declines to create a federal common law rule restraining an ERISA fiduciary or administrator from seeking subrogation regarding benefits disbursed pursuant to an ERISA plan until the plan participant has been made whole for the loss giving rise to the claim for benefits.

Second, a review of the decisional law forecloses Polin's contention because some courts have expressly considered and rejected the very rule under identical circumstances. For instance, in *Cutting,* Cutting, an ERISA welfare-plan participant, was injured in an automobile collision by the negligence of an uninsured third party. Cutting recovered under her uninsured insurance policy, as well as settled her claim against the manufacturer of an allegedly defective automobile. *See Cutting,* 820 F.Supp. at 1149. Despite recovering from these two sources, Cutting's medical expenses exceeded her recovery, so she applied to the welfare plan for benefits. Invoking the subrogation provision of the welfare plan, which was virtually identical to the present Plan, *see id.* at 1149–50, the plan administrator required Cutting to execute a reimbursement agreement promising to subrogate the plan. Cutting refused and sought an order from state court compelling disbursement without subrogation until she was fully reimbursed. *See id.* at 1150. The administrator removed the suit to federal district court and moved for summary judgment, asserting that it need not disburse payments until Cutting executed the reimbursement agreement according to the plan. The district court granted the administra-

tor's motion for summary judgment. First, the district court explained that state subrogation law, which required that Cutting be fully satisfied prior to subrogation, was preempted by ERISA. *See id.* at 1150. Second, the district court declined to create a federal common law rule mirroring the state's "make whole" rule, explaining that creating such a rule was likely prohibited under *FMC Corp.. See id.* at 1150–51. In declining to fashion such a rule, the court noted that ERISA did not govern the substance of employee welfare plans, and in this connection, employers owe no duty to provide benefits. Moreover, under the plain language of the plan, the administrator was not obligated to disburse payments prior to seeking subrogation, while Cutting was obliged to execute the reimbursement agreement. *See id.* at 1152. In rendering this conclusion, the district court explained:

> [T]here is no need to fashion an equitable remedy under ERISA where there is no violation of ERISA under the written terms of the plan. Creating a federal common law make-whole rule of subrogation would substantially change the design of defendant's Plan. To do so would be tantamount to dictating the substance of defendant's Plan, and would have the effect of allowing state law to govern in an area in which state law is preempted.

*Id.* at 1152–53 (internal quotation marks omitted).

On appeal, the Seventh Circuit affirmed. After recognizing that the federal courts have the power to make federal common law under ERISA, the court stated that this power should be used sparingly, as a "gap filler," particularly because the right to expand or abridge parties' rights under ERISA welfare benefits plans was at best "uncertain." *See Cutting,* 993 F.2d at 1297. Respecting the "make-whole" rule, the court addressed the pros and cons of such a rule, but ultimately predicated its affirmance on the fact that regardless of the merits or demerits of such a rule, the plain language of the plan at issue clearly overrode any such rule. *See id.* at 1298–99. Because the plan unambiguously provided for subrogation of " 'all claims' " and " 'any and all payments,' "

and vested interpretative power with the administrator, Cutting was compelled to execute the reimbursement agreement despite the fact that no funds had been disbursed. *See id.* This conclusion finds support in the case law. *See Fields v. Farmers Ins. Co.*, 18 F.3d 831, 834–36 (10th Cir.1994) (holding that regardless of the merits or demerits of the make whole rule under an insurance contract, it could be overridden by the express language in the contract); *Provident Life & Accident Ins. Co. v. Linthicum*, 930 F.2d 14, 15 (8th Cir.1991) (per curiam) (holding that ERISA permits subrogation provisions in a welfare benefits plan to be enforced regardless of whether the beneficiary has been made whole); *see also Ryan*, 78 F.3d at 127 (holding that an unambiguous subrogation provision providing for an employee-participant to repay all money received in settlement from a third party does not require applying a federal common law rule absent a showing that such a rule is necessary to effectuate an ERISA policy); *Blackburn*, 933 F.Supp. at 729 (holding that an ERISA subrogation provision providing that the employee-participant reimburse the employer for all monies received from a third party trumps the federal common law rule permitting a one-third reduction in the amount reimbursed for attorney's fees).

These authorities compel the conclusion that Life Cycle is entitled to summary judgment. In unambiguous terms, the subrogation provision of the Plan provides that Polin "sign a written agreement to *repay the Plan in full out of any monies* that the covered person receives from a negligent person or organization." (emphasis added). Thus, "the Plan shall be subrogated to *all of the Covered Person's rights of recovery* of those benefits against any person or organization." (emphasis added). The plain language of the Plan dictates that Polin reimburse it for all of its expenses, and there is no requirement that Life Cycle postpone enforcing its subrogation rights until Polin's expenses have first been fully satisfied. Indeed, mandating such a requirement via creation of a federal common law rule contravenes ERISA.

Polin's strained interpretation may find its genesis in the fact that Seifert took a fee from the settlement and that if Polin is responsible to Life Cycle for the full amount of the settlement, then Polin will net less than full payment for her medical expenses. While sympathetic to Polin's plight, Life Cycle cannot be made the vehicle to absorb Seifert's fees. Compelling Life Cycle into such a role not only violates the uniformity mandated by ERISA, but also the plain language of the Plan.

**B.**

■ Having concluded that Life Cycle's interpretation of the subrogation provision is not unlawful, the court must determine whether this interpretation can be sustained. Here, the Plan vests discretion to interpret its provisions exclusively with Life Cycle, which ERISA, *see* 29 U.S.C.A. § 1002(21)(A), and the case law, *see, e.g., Firestone Tire & Rubber Co.*, 489 U.S. at 111, 109 S.Ct. at 954–55; *Wendy's Int'l, Inc. v. Karsko*, 94 F.3d 1010, 1012 (6th Cir.1996); *Cooper Tire*, 48 F.3d at 370, sanction. Specifically, the Plan provides that "full discretionary authority to interpret and apply all Plan provisions, including, but not limited to, all issues concerning eligibility for and determination of benefits" are within the sole purview of Life Cycle in its capacity as fiduciary and administrator. Courts have concluded that similar language reserving the prerogative of interpreting plans to fiduciaries or administrators is permissible provided the interpretation is reasonable. *See, e.g., Cooper Tire*, 48 F.3d at 370 (holding that the words " 'construe and interpret' " granted the administrator of the plan the authority to interpret the plan); *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1186–87 (4th Cir.1989) (holding that language providing that the fiduciary " 'determine[s] all benefits and resolve[s] all questions pertaining to administration, interpretation and application of Plan provisions' " conferred " 'interpretative' " rights on the fiduciary); *Springs Valley Bank & Trust Co. v. Carpenter*, 885 F.Supp. 1131, 1135–36 (N.D.Ind.1993) (ruling that language providing that "[t]he Plan Administrator shall have authority to interpret the provisions of the Plan and establish rules for the administration of the Plan" vested authority in the administrator); *Cutting*, 820 F.Supp. at 1155 (holding that because the

plan made clear that the plan administrator had the "sole discretion" to interpret the plan, that interpretation controls if reasonable).

 Having concluded that the language reserves exclusively the right of interpreting the Plan to Life Cycle, the court must now determine the proper standard for reviewing the Plan. Analogyzing from trust law, in *Firestone Tire & Rubber Co.*, the Supreme Court concluded that if an ERISA plan charges a fiduciary or administrator to exercise discretion in interpreting the plan's provision, the federal courts must not disturb the fiduciary's interpretation "if reasonable." *Firestone Tire & Rubber Co.*, 489 U.S. at 111, 109 S.Ct. at 954. According to the Court, this conclusion inexorably followed because "ERISA abounds with the language and terminology of trust law." *Id.* at 110, 109 S.Ct. at 954. If, as here, therefore, a fiduciary is "in existence, and capable of acting, a court of equity will not interfere to control [it] in the exercise of a discretion vested in [it] by the instrument under which [it] act[s]." *Id.* (quoting *Nichols v. Eaton,* 91 U.S. 716, 724–25, 23 L.Ed. 254 (1875)). Based on these tenets of trust law, the Court concluded that in reviewing the actions of a fiduciary who has been granted discretion to interpret the terms of an ERISA plan, the federal courts must defer to the fiduciary's interpretation provided it is not an abuse of discretion. Accordingly, the court reviews Life Cycle's interpretation for an abuse of discretion, precluded from "disturb[ing that] interpretation if it is reasonable, even if [the court] come[s] to a different conclusion independently." *See Doe v. Group Hospitalization & Medical Servs.,* 3 F.3d 80, 85 (4th Cir.1993).[3] The hallmark of this standard of review is one of reason, which connotes a lack of arbitrary or capricious conduct. The courts, therefore, also term this standard as the "arbitrary and capricious" standard.

*See, e.g., Wendy's Int'l, Inc.,* 94 F.3d at 1012 (holding that *Firestone Tire & Rubber Co.* announced an "arbitrary and capricious standard" for ERISA plans granting interpretation rights to an administrator and also using this term interchangeably with "reasonable"); *Cooper Tire,* 48 F.3d at 371 (referring to this standard as an "abuse of discretion" standard); *Doe,* 3 F.3d at 85 (reviewing for a "reasonable" plan and noting that a fiduciary's conduct is "reviewed only for abuse"); *Cutting,* 993 F.2d at 1295 (reviewing for "arbitrary or capricious decisions"); *Blank v. Bethlehem Steel Corp.,* 926 F.2d 1090, 1093 (11th Cir.) (applying "arbitrary and capricious" standard), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *de Nobel,* 885 F.2d at 1186–87 (reviewing an ERISA plan that confers discretion on the administrator for "reasonableness" and also using the term "arbitrary and capricious"); *Carpenter,* 885 F.Supp. at 1136 (noting that the decisional law uses the terms interchangeably and explaining that any difference is purely semantic) (collecting cases discussing this proposition). In reviewing under this standard, the court examines:

1) whether the interpretation is consistent with the goals of the Plan; 2) whether it renders any language in the Plan meaningless or internally inconsistent; 3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether [Life Cycle] has interpreted the provision at issue consistently; and 5) whether the interpretation is contrary to the clear language of the Plan.

*Cooper Tire,* 48 F.3d at 371; *see also Blank,* 926 F.2d at 1093 (limiting inquiry to determining whether administrator acted rationally and in good faith and articulating similar factors guiding the inquiry into good faith). Strict compliance with a plan is reasonable, precluding "a finding of arbitrary action."

---

3. The *Firestone Tire & Rubber Co.,* Court did not adopt a wholly differential standard of review applicable in all cases. A plenary standard of review applies if the plan "administrator or fiduciary is operating under a possible or actual conflict of interest." *Firestone Tire & Rubber Co.,* 489 U.S. at 115, 109 S.Ct. at 957. In this respect, if a plan grants discretion "to an administrator or fiduciary who is operating under a

conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting *Restatement (Second) of Trusts* § 187 cmt. d (1959)) (alteration in original); *see also, Doe,* 3 F.3d at 87 (discussing the interplay between a fiduciary discretion and a conflict of interest and holding that the standard of review is less differential if there is such a conflict).

*Nash by Nash v. Krivaja Beechbrook Corp.,* 866 F.2d 1053, 1055 (8th Cir.1989); *see also Cutting,* 820 F.Supp. at 1154 (explaining that enforcing a plan as written does not constitute bad faith).

 Application of these factors establishes that Life Cycle has acted reasonably, not arbitrarily or capriciously. First, Life Cycle's interpretation of the Plan comports with the Plan's goals because, as fiduciary, Life Cycle is responsible for all Plan participants, and, if all participants could pursue any remedies they choose in any manner, then the Plan would lack stability and predictability. Moreover, Life Cycle has a duty not only to Polin, but to all participants, and permitting Polin to settle for less than her claims and then providing releases to the tortfeasor compromises and diminishes other participants' benefits. *See Cooper Tire,* 48 F.3d at 371 (holding that a like interpretation by a fiduciary was consistent with the plan's goals); *Cutting,* 993 F.2d at 1297–98 (discussing the benefits, wages, and lesser welfare-plan benefits versus higher welfare-plan benefits and lesser wages for participants and explaining that a fiduciary has the responsibility to ensure all participants' interests). Accordingly, Life Cycle's interpretation furthers the Plan's goals of providing benefits to all employees.

Second, Life Cycle's interpretation makes sense, rather than renders the Plan language meaningless or inconsistent, and in this respect, the plain language of ERISA plans must be enforced as written, *see Ryan,* 78 F.3d at 126 (enforcing an ERISA subrogation plan, similar to the instant Plan, as written because the clear language of the plan mandated its application); *Cutting,* 993 F.2d at 1298–99 (same); *Blackburn,* 933 F.Supp. at 729 (same). Here, the grant of discretion to Life Cycle comports with the subrogation provision because both ensure that participants will not act independently in resolving their disputes with third-parties, thereby compromising the Plan's funds. *See Cooper Tire,* 48 F.3d at 371 (sustaining a like interpretation employing like language). If participants could act independently, then reckless conduct by some participants could consume all benefits and expose other partic-

ipants to decreased benefits. *See FMC Corp.,* 498 U.S. at 60, 111 S.Ct. at 408–09 (recognizing that employers could offset expenses with decreased benefits); *Kennedy v. Connecticut Gen. Life Ins. Co.,* 924 F.2d 698, 699 (7th Cir.1991) (observing that the consequences of unscrupulous plan participants can increase the cost of benefits). Moreover, a possible consequence of independent conduct by participants could be eradication, rather than reduction, of benefits; thus, such unchecked independence may deprive plan participants of any remedy given that ERISA creates no substantive rights to welfare-plan benefits, *see Metropolitan Life Ins. Co.,* 471 U.S. at 732, 105 S.Ct. at 2385. Welfare-plan participants, whose rights and obligations are collective, simply cannot exercise such independence respecting welfare-plan benefits without permission from the plan sponsor because their action leads to potentially great ramifications on regarding co-participants.

Third, Life Cycle's interpretation does not conflict with the substantive or procedural provisions of ERISA. A predominant theme of ERISA is to create uniform, national standards respecting procedural mechanisms for welfare-benefits plans, *see id.,* so providing, or not providing, welfare benefits does not conflict with ERISA, *see, e.g., McGann v. H & H Music Co.,* 946 F.2d 401, 407 (5th Cir.1991) (stating that ERISA does not dictate an employer's control over welfare-benefits plans), *cert. denied,* 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992); *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 78 (3d Cir.1991) (holding that ERISA creates no substantive requirements and thus an employer can provide benefits as he sees fit), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1479, 117 L.Ed.2d 622 (1992); *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 603 (7th Cir. 1989) (explaining that employers may terminate welfare-benefit plans). Likewise, Life Cycle's interpretation poses no procedural conflicts, and indeed, as explained, enforcing the language of the Plan promotes the salutary purpose of ensuring the greatest benefits for all participants, as well as enforcing the plain language of the Plan. Because one purpose of ERISA is to ensure that plan participants receive their promised benefits,

enforcing Life Cycle's interpretation serves this purpose by maintaining the integrity of the Plan through zealous enforcement of claims respecting third parties. *See Davis v. Nepco Employees Mut. Benefit Ass'n*, 51 F.3d 752, 755-56 (7th Cir.1995) (noting that employers may pursue third parties perhaps more ardently than tort victims, but recognizing the pitfalls with this approach). While Polin is exclusively concerned with her own benefits, Life Cycle is concerned with the benefits of all of its employees, and therefore, has a duty to protect the interests of all of its employees; so naturally it will fervently, yet evenly, pursue all claims respecting third parties.

Fourth, there is no evidence that Life Cycle interprets the plan inconsistently. Rather, Life Cycle's uncontested representations are to the contrary. Life Cycle's continued and steadfast refusal to pay under the Plan demonstrates, at least for purposes of this suit, that Life Cycle has not advanced inconsistent positions regarding the Plan or its interpretation. *See Cooper Tire*, 48 F.3d at 371 (explaining that the employer had taken inconsistent positions regarding interpretation of the plan).

Fifth, as explained, Life Cycle's interpretation is not contrary to the clear language of the plan. The Plan language is unambiguous and hence must be enforced as written. *See Ryan*, 78 F.3d at 128; *Shell v. Amalgamated Cotton Garment*, 43 F.3d 364, 366 (8th Cir. 1994). Pursuant to the plain language of the Plan, participants such as Polin must reimburse their employers in the event they incur expenses requiring disbursement of benefits from an ERISA plan as a result of negligence of third parties, and many plans contain such reimbursement requirements in their subrogation provisions. *See, e.g., Ryan*, 78 F.3d at 124 (holding that employee-participant must reimburse its employer-administrator for recovery from the negligence of a third party under a subrogation clause quite similar to the instant subrogation clause); *Shell*, 43 F.3d at 366 (same); *Linthicum*, 930 F.2d at 15 (same); *Blackburn*, 933 F.Supp. at 729 (same); *Cutting*, 820 F.Supp. at 1155 (same); *see also Fields*, 18 F.3d at 834-36 (same within the context of an insurance contract). Declining to enforce the Plan as written would result in violating the clear language of the Plan. Unequivocally, the present Plan provides for notification of any claims potentially asserted against third parties that implicate benefits under the Plan. In addition, the Plan positively mandates permission from Life Cycle to settle claims; yet Polin satisfied neither of these obligations. Accordingly, the court concludes that Life Cycle's interpretation is reasonable, not arbitrary or capricious, and thus must be enforced.

III.

The Plan provides that Polin notify Life Cycle of any claims respecting the negligence of third parties that could involve Plan benefits and reimburse Life Cycle for all expenses incurred by the negligence of third parties implicating Plan benefits, which Polin has refused to do. Pursuant to the plain language of the Plan, Life Cycle's right to enforce the subrogation is not contingent on Polin's being first made whole, and the court declines to fashion such a federal common law rule. Accordingly, Life Cycle's motion for summary judgment is granted.

**IT IS SO ORDERED.**