**Milton F. HARTENBOWER, as Guardian of John Hartenbower, a minor, Plaintiff,**

v.

**ELECTRICAL SPECIALTIES CO. HEALTH BENEFIT PLAN, through its Contract Administrator, Kepple & Company, Inc., N.R.O. Enterprises, Invc., f/k/a Electrical Specialties, Co., an Illinois corporation, and North Atlantic Casualty and Surety Insurance Company, Inc., a/k/a Vasa North Atlantic Insurance Company, Defendants.**

No. 95 C 1638.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 16, 1997.

Douglas Alan Gift, John S. Duncan, Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., LaSalle, IL, Lawrence Michael Kaschak, Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., Ottawa, IL, for Milton F. Hartenbower.

Antonia Sexton Pritchard, McBride, Baker & Coles, Chicago, IL, David G. Lubben, Robert Riffle, Keck, Mahin & Cate, Peoria, IL, for Electrical Specialties Co. Health Ben. Plan, N.R.O. Enterprises, Inc.

Antonia Sexton Pritchard, McBride, Baker & Coles, Chicago, IL, David G. Lubben, Keck, Mahin & Cate, Peoria, IL, John Thomas Bycraft, Barnes & Thornburg, Chicago, IL, for North Atlantic Cas. and Sur. Ins. Co.

### MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiff Milton F. Hartenbower, as guardian of John Hartenbower,[1] a minor, brings this declaratory judgment action against Defendants Electrical Specialties Co. Health Benefit Plan through its contract administrator Kepple and Co., Inc. ("the Plan"); N.R.O. Enterprises, Inc., f/k/a Electrical Specialties Co., an Illinois corporation ("N.R.O."); and North Atlantic Casualty and Surety Insurance Co., Inc., a/k/a VASA North Atlantic Insurance Co. ("VASA"). Hartenbower asks the court to declare that the defendants have an obligation to pay all or part of the medical and hospital expenses incurred because of injuries sustained by John Hartenbower when a motor vehicle struck him on November 13, 1992. Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[2] For reasons set forth below, the court grants summary judgment for N.R.O. and VASA and denies summary judgment for the Plan.

### Background

On November 13, 1992, a car driven by Carolyn Dent struck John Hartenbower while he walked along Main Street in Losant, Illinois. (Am.Compl.¶ 4.) Because of this accident, John Hartenbower incurred medical bills of more than $85,000. (*Id.* ¶ 6.)

John Hartenbower is the minor son of Milton Hartenbower, who at the time of the accident was employed by Electrical Specialties Co. (*Id.* ¶ 2.) Electrical Specialties established a Health Benefit Plan ("the Plan") for its employees, which was in effect at the time of the accident. (Plan's 12(M) ¶ 3.)[3] The Plan is administered by Kepple and Co., (Am.Compl.¶ 3), and includes coverage for hospital and medical expenses, (Plan's 12(M) Ex. 2 at 1), for both employees and their dependents, (*id.* at 11), The Plan does not dispute that its plan covered John Harten-

---

**1.** In the remainder of this opinion, "Hartenbower" will refer to Milton Hartenbower as guardian of John Hartenbower, unless otherwise noted.

**2.** Defendants have filed two separate motions for summary judgments, one on behalf of both the

Plan and N.R.O., and the other on behalf of VASA.

**3.** Throughout this opinion, "12(M)" refers to the defendants' Statement of Undisputed Material Facts pursuant to Local Rule 12(M).

bower. Nevertheless, the Plan has refused to pay Milton Hartenbower any amount for John Hartenbower's medical and hospital expenses. (Am.Compl.¶ 8.)

Less than nine months after John Hartenbower's accident, TranTechnology purchased Electrical Specialties, (Plan's 12(M) Ex. 10), and changed the name of Electrical Specialties to N.R.O. Enterprises, Inc., (Am. Compl.¶ 14). Shortly after the sale, N.R.O. canceled the Plan, (id.), without allocating any funds to pay for John Hartenbower's injuries, (Plan's 12(M) Exs. 10, 11). N.R.O. also stopped making payments on its stop-loss insurance policy with North Atlantic Casualty and Surety Insurance Co., a/k/a VASA North Atlantic Insurance Co. ("VASA"), (VASA's 12(M) ¶ 17), and VASA terminated the policy, (id. ¶¶ 16, 18).

Milton Hartenbower, as John Hartenbower's guardian, filed a lawsuit against Carolyn Dent. (Am.Compl.¶ 9.) Dent's automobile liability insurance company, State Farm Insurance Company, and Hartenbower's underinsured motorist policy, Pekin Insurance Company, have each agreed to pay $50,000 to Hartenbower if he releases them from any further liability. (Plan's 12(M) Exs. 5, 7.) Hartenbower wishes to allocate $25,000 of these settlement monies to medical and hospital expenses and the remainder to future medical costs and pain and suffering. (Id. Ex. 10.) Although the Plan recently joined this lawsuit, for more than four years it refused to get involved either to protect its interests or to assist its employee. (Id. Exs. 4, 6. 10, 12.) Neither did N.R.O. file a claim with its stop-loss insurer, VASA, to cover its potential liability for Hartenbower's injuries. (VASA 12(M) ¶ 20.) Hartenbower's attorney fees for pursuing the claim against Dent are more than $33,000. (Pl. Resp. to Plan's Mot. Ex. A.)

N.R.O.'s plan document contains a subrogation clause that allows the Plan to pursue reimbursement against third parties, who are liable for injuries, "in the event" that the Plan pays any benefits. (Plan's 12(M) Ex. 2 at 33.) Employees must execute subrogation agreements to assist the Plan in recovering its expenses. (Id. at 34.) Although the Plan has not made any payments to Hartenbower,

it requested a signed subrogation agreement from him, which he has not yet executed. The Plan document also contains an excess insurance clause that makes the Plan secondary to other sources of indemnification. (Id.) Furthermore, N.R.O. has the authority to make reasonable, good faith interpretations of the plan language. (Id. at 50.)

The purpose of N.R.O's Group Health Benefit Plan is to provide "hospital and medical benefits ... for the benefit of [its] Employees." (Plan's 12(M) Ex. 2 at .1.) The Plan's excess insurance clause states in part:

> If at the time of Injury or Sickness there is available to the Covered Person or Covered Dependent any other insurance, or other forms of indemnification, including but not limited to judgment at law or settlements, the benefits under this Plan shall apply only as excess insurance over such other sources of indemnification; by way of illustrating but not in limitation, this provision shall be applicable to those Expenses Incurred as the result of Sickness or Injury when: (a) the Covered Person or Covered Dependent is injured by or in the course of operating a motor vehicle

(Plan's 12(M) Ex. 2 § 7.8 at 34–35.) The Subrogation Clause states in pertinent part:

> In the event any benefits or services of any kind are furnished to a Covered Person or Covered Dependent, or payment made or credit extended to or on behalf of any Covered Person or Covered Dependent for a physical condition or Injury caused by a third party or for which a third party may be liable, the Plan shall be subrogated and shall succeed to individual rights of recovery against any such third party to the lull extent of the value of any such benefits or services furnished or payments made or credit extended. The Covered Person or Covered Dependent shall, at the Plan's request, take such action, furnish such information and assistance, and execute such documents as the Plan may require to facilitate enforcement of its rights hereunder. In the event of the covered Person's or Covered Dependent's failure to comply with any such request, the Plan shall be entitled to withhold benefits, services, payments or credits due un-

der the Plan, or to initiate or maintain any legal proceedings it deems necessary to protect the rights of the Plan, as provided herein. The Covered Person or Covered Dependent shall do nothing after acceptance of benefits hereunder to prejudice the subrogation rights of the Plan.

(Plan's 12(M) Ex. 2 § 7.7 at 33–34.)

Hartenbower filed this amended complaint seeking a declaratory judgment that defendants N.R.O., the Plan, and VASA have an obligation to pay all or a portion of John Hartenbower's medical bills. The defendants originally filed this action in Illinois state court, (Plan's 12(M) ¶ 25) and later removed it to this court.

### Analysis

Electrical Specialties Co. Health Benefit Plan, through its contract administrator, Kepple and Co., Inc. ("the Plan"); N.R.O. Enterprises, Inc., f/k/a Electrical Specialties Co., an Illinois corporation ("N.R.O."); and North Atlantic Casualty and Surety Insurance Co., Inc., a/k/a VASA North Atlantic Insurance Co. ("VASA") have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[4] The court will render summary judgment only if the factual record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 (7th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). The court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." *Sullivan v. Cox,* 78 F.3d 322, 325 (7th Cir.1996) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In ruling on a motion to dismiss for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Bratton,* 77 F.3d at 171 (citation omitted); *Sullivan,* 78 F.3d at 325 (citation omitted)

On a motion for summary judgment, the moving party "bears the initial burden of showing that no genuine issue of material fact exists." *Hudson Ins. Co. v. City of*

*Chicago Heights,* 48 F.3d 234, 237 (7th Cir. 1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Then the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.) (citations omitted), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995).

The plaintiff filed this amended complaint against the defendants to declare that they have an obligation to pay all or part of John Hartenbower's medical bills. (*Id.* Count I, ¶ 16 & Count II, ¶ 20.) In response, the Plan argues that it has no obligation to the plaintiff because of the excess insurance and subrogation clauses in the plan document. N.R.O. argues that it is not a proper party to the suit: the plaintiff's claims are with the employee benefit plan, not with the employer. VASA argues that the plaintiff lacks standing because a privity of contract existed between VASA and the employer and not between VASA and the beneficiaries of the Plan. The court treats each of the defendants' claims separately.

## I. THE PLAN

The Plan moves for summary judgment because it properly rejected the plaintiff's claims, acting within its discretionary powers. (Plan's Mem. Supp. Mot. at 2–3.) Furthermore, the Plan believes that its excess insurance clause precludes any liability to the plaintiff under the circumstances. (*Id.* at 3.) Finally, the Plan argues that the plaintiff's failure to sign its subrogation agreement is a violation of its subrogation clause and allows the Plan to refuse to reimburse the plaintiff for any associated medical expenses. (*Id.*)

### A. Applicable Law

Congress promulgated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq (1994), "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463

---

4. See, *supra* note 1.

U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). ERISA subjects employee benefit plans to federal regulation, *id.*, and it includes "welfare plans" that provide medical care to employees or to their beneficiaries, § 1002(1). Although ERISA does not require employers, to provide any particular benefits, it does subject employer provided welfare plans to "uniform ... rules concerning reporting, disclosure, and fiduciary responsibility." *Shaw*, 463 U.S. at 91, 103 S.Ct. at 2897.

Milton Hartenbower's employer, N.R.O., established a self-funded employee welfare plan (the Plan) in 1990. (Plan's 12(M) ¶ 3.) The Plan covered John Hartenbower under the Plan as a dependent at the time of his accident. (*Id.* Ex. 2 at 2–3.) Thus, the Plan is an employee welfare plan regulated by ERISA. Furthermore, ERISA grants federal courts jurisdiction to hear cases brought by "a participant or beneficiary ... to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B); § 1132(e); *see also Blackburn v. Sundstrand Corp.*, 115 F.3d 493, 495 (7th Cir.1997) (finding that claims arise under ERISA where plaintiff employee seeks payment of benefits from defendant employee welfare plan).

ERISA does not intend to regulate the content of employee welfare plans; this is left to the discretion of the plan administrator. *Land v. Chicago Truck Drivers, Union Health and Welfare Fund*, 25 F.3d 509, 514 (7th Cir.1994). Plan administrators cannot, however, make "arbitrary or capricious" decisions. *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1295 (7th Cir.), *cert. denied*, 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993). Courts will review the denial of benefits by plan administrators to determine if the plan has been properly interpreted. The Supreme Court held that the "denial of benefits.. is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or plan fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). The Seventh Circuit has determined that

[t]he extent of discretion determines the extent of judicial deference. When fiduciaries have the discretion to make "reasonable" interpretations of a plan, their decisions are reviewed according to the familiar abuse-of-discretion standard. A decision constitutes an abuse of discretion when it is "not just clearly incorrect but downright unreasonable." When fiduciaries are bound to interpret the plan under the broad standard of good faith, their discretion is even more extensive, and judicial review is even more deferential. Courts will then examine the exercise of this degree of discretion to determine whether it is arbitrary and capricious.

*Morton v. Smith*, 91 F.3d 867, 870 (7th Cir. 1996) (citations omitted).

The Plan document states that "[f]inal authority for interpretation of the Plan is vested in the Employer. Any interpretation so required by the Employer shall be made in *good faith*, subject to *reasonable* care and prudence, and all such interpretations are final." (Plan's 12(M) Ex. 2 at 50 (emphasis added).) Thus, the plan grants N.R.O. discretionary authority to interpret the provisions of the plan. Consequently, this court must review N.R.O.'s interpretations under either an "abuse of discretion" or an "arbitrary and capricious" standard.

## B. Excess Insurance Clause: Make Whole Provision

N.R.O.'s health benefit plan includes an excess insurance provision that stipulates that the Plan's benefits "apply only as excess insurance" when a beneficiary has "any other insurance, or other forms of indemnification." (Plan's 12(M) Ex. 2 at 33.) Furthermore, the plan document specifically lists injuries resulting from the operation of a motor vehicle as an example where the Plan would serve as excess insurance. (*Id.* at 35.) Although the plan document does not define the term "excess insurance," courts have noted that "[a]n excess insurance clause purports to provide an insured with only secondary (or excess) protection when coverage from another insurance policy is available." *Northeast Dep't ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*,

764 F.2d 147, 160 (3d Cir.1985); *see also,* Black's Law Dictionary 562 (6th ed. 1990) (stating that an excess policy restricts the insurer's· liability to "the excess above and beyond that which may be collected on other insurance").

The Plan argues that the excess insurance clause precludes its liability because other insurance carriers pledged $100,000 and John Hartenbower's medical bills are (to date) less than this amount. Hartenbower disagrees, stating that the excess insurance clause only applies after he has been "made whole." Hartenbower argues that $75,030 of the proposed $100,000 payments by the other carriers should be allocated to "future medical expenses [and] pain and suffering." (Plan's 12(M) Ex. 10; Pl.'s Resp. to Plan's Mot. at 4.) Therefore, there would only be $25,000 to cover John Hartenbower's medical bills, and the Plan's excess insurance provision would be liable for medical costs above that amount.

■ "It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for her injuries, that is, has been made whole." *Barnes v. Independent Auto. Dealers Ass'n of Cal. Health and Welfare Benefit Plan,* 64 F.3d 1389, 1394 (9th Cir.1995). The make-whole doctrine usually applies when an insurance carrier has already made payments to its insured and is attempting to exercise its right of subrogation. The doctrine also applies where, as here, the Plan has not made any payments and does not intend to make any payments until the other insurance carriers' payments are insufficient to cover the insured's medical bills. *See id.* at 1396.

ERISA does not explicitly contain a make-whole provision. Nevertheless, Congress intended that a body of federal common law would develop to supplement and complement the rights and obligations delineated under ERISA. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *see also Cutting,* 993 F.2d at 1296 ("There is no doubt about

the authority of the federal courts to create common law for use in ERISA cases."). However, the Seventh Circuit has ruled that an employee welfare plan can explicitly preclude a make-whole provision through "clear language in the plan," *Cutting,* 993 F.2d at 1298–99, but it has not determined whether make-whole should be a default provision where no plan language "clearly" excludes it. The Supreme Court and the Seventh Circuit have not ruled on whether absent plan language excluding it, the make whole-provision should be a part of federal common law. Most district courts within the Seventh Circuit have applied the make-whole doctrine as a default in most situations. For example, a court applied it where the plan administrators did not have any discretion and state law allowed it. *Sanders v. Scheideler,* 816 F.Supp. 1338, 1347 (W.D.Wis.1993), *aff'd,* 25 F.3d 1053 (7th Cir.1994). A court applied the make-whole rule where the plan administrators did not have any discretion and the plan did not clearly overrule it. *Murzyn v. Amoco Corp.,* 925 F.Supp. 594, 601 (N.D.Ind. 1995). And, in a situation where the plan administrators had discretion and the plan did not clearly preclude the make-whole provision, a court denied the plan's summary judgment motions. *Speciale v. Seybold,* 951 F.Supp. 740, 745 (N.D.Ill.1996). In *Speciale,* the court ruled that the fact-finder would have to determine if the plan acted reasonably under its discretion when it refused to apply the make-whole rule. *Id.*

Other circuits and districts have applied the make-whole provision as default. The Ninth Circuit applies it as default "in the absence of a clear contract provision to the contrary." *Barnes,* 64 F.3d at 1395. The Eleventh Circuit goes even further: it applies the make-whole rule as the default, but it also refuses to allow discretionary interpretation to determine whether a plan has "clearly" overruled the rule. *Cagle v. Bruner,* 112 F.3d 1510, 1522 (11th Cir.1997). The Eleventh Circuit requires *explicit* plan language to overrule the make-whole default. *Id.*[5] Other districts follow the rationale that

---

5. Although the Fifth Circuit has not decided the issue, in dicta it stated that it has "serious doubts whether [it] would ever approve or adopt the

Make Whole rule as this circuit's default rule." *Sunbeam–Oster Co. Group Benefits Plan for Sala-*

the make-whole doctrine applies where plan language does not clearly preclude it. *See, e.g., National Employee Benefit Trust of the Associated Gen. Contractors of America v. Sullivan,* 940 F.Supp. 956, 959 (W.D.La. 1996); *Marshall v. Employers Health Ins. Co.,* 927 F.Supp. 1068, 1073 (M.D.Tenn.1996); *Waller v. Hormel Foods Corp.,* 950 F.Supp. 941, 944 (D.Minn.1996); *Trustees of Hotel Employees Int'l Union Welfare Fund v. Kirby,* 890 F.Supp. 939, 945 (D.Nev.1995).

Although considerable momentum and precedent exist for applying the make-whole doctrine as the default rule, the Plan would have this court follow an unpublished district court ruling in *Mahrt v. Plumbers' Local 63 and Steamfitters Local 353 Joint Welfare Plan,* No. 93–1389 (C.D.Ill. Oct. 14, 1994). In *Mahrt* the employee welfare plan contained an excess insurance clause that is identical to the one found in N.R.O.'s plan. *Mahrt,* slip op. at 6–7. The *Mahrt* court found that the "plain language" of the plan precluded applying the make-whole doctrine.

■ This court finds more persuasive the decision of the Eleventh Circuit. in *Cagle*. Employees should unequivocally know if their plan disallows application of the make-whole rule. Congress promulgated ERISA to insure "the continued well-being and security ... of employees and their dependents" whom welfare plans affect. 29 U.S.C. § 1001(a) (1994). Plans should give employees plain information regarding the administration of their plans. *Id.* ERISA's policy promotes "uniformity, certainty and predictability for both plan beneficiaries and their trustees." *McGurl v. Teamsters Local 560 Trucking Employees Welfare Fund,* 925 F.Supp. 280, 292 (D.N.J.1996), *aff'd,* 124 F.3d 471 (3d Cir.1997); *see also Carpenter v. Modern Drop Forge,* 919 F.Supp. 1198, 1203 (N.D.Ind.1995). Although ERISA does not require welfare plans to maintain minimum benefits, it does promulgate administrative requirements. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645. 651, 115 S.Ct. 1671, 1674–75, 131 L.Ed.2d 695 (1995). Thus, although ERISA does not require that an employee welfare plan follow the make-

whole doctrine, it should *plainly* state any intention not to do so. *Cf. Cutting,* 993 F.2d at 1298–99 (finding that "the make-whole rule .... can be overridden by clear language in the plan"). Consequently, "[a]n ERISA plan overrides the make whole doctrine only if it includes language 'specifically allow[ing] the Plan the right of first reimbursement out of any recovery [the participant] was able to obtain even if [the participant] were not made whole.'" *Cagle,* 112 F.3d at 1522 (*quoting Barnes,* 64 F.3d at 1395) (alterations in original).

■ The Plan in this case has not explicitly disallowed the make-whole doctrine. The Plan's Subrogation and Excess Insurance Provisions should be analyzed together. "Subrogation is the insurer's right to be put in the position of the insured, in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer." *Barnes,* 64 F.3d at 1392. An excess insurance clause "provides an insured with only secondary (or excess) protection when coverage from another insurance policy is available." *Northeast,* 764 F.2d at 160. Therefore, the Plan's hospital and medical benefits will provide coverage to the extent not provided by other insurance carriers. Furthermore, if the Plan has made any payments, it has the right to recover up to the value of its payments from third parties responsible for injuring the Plan participant. The Plan document does not state, however, that it has the "right of first reimbursement" or the "right to reimbursement even if the plan participant is not made whole." Therefore, Hartenbower is entitled to be made whole and the Plan is liable as an excess carrier for any medical or hospital payments not covered by insurance or indemnification. Consequently, the court denies Plan's motion for summary judgment.

Although this court finds that the plan administrator should apply the make-whole doctrine without regard to discretionary interpretation, a discretionary interpretation would not yield a different result. As noted above, the Plan's administrators have the discretion to interpret the plan. It is not

*ried and Non–Bargaining Hourly Employees v. Whitehurst,* 102 F.3d 1368, 1378 (5th Cir.1996).

clear whether the court should review the Plan's decisions under an "abuse of discretion" or "arbitrary and capricious" standard. Nevertheless. the court will review under the more deferential "arbitrary and capricious" standard.

The arbitrary and capricious standard holds that a trustee's decision shall not be overturned on [an ERISA denial of benefits] matter, absent special circumstances such as fraud or bad faith, if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." "[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents."... If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

*Exbom v. Central States, Health and Welfare Fund,* 900 F.2d 1138, 1142–43 (7th Cir.1990) (citations omitted). Furthermore, the court can consider potential conflicts of interest. *Firestone Tire,* 489 U.S. at 115, 109 S.Ct. at 956–57; *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1035 (7th Cir.1990).

■ In this case the Plan acted in an arbitrary and capricious manner by refusing to make any payments to Hartenbower. When John Hartenbower was initially injured there was no way to determine if the third party tortfeasor would pay all of John's medical bills. Nevertheless, the Plan sat on the sidelines and steadfastly refused to get involved. (*See generally* Plan's 12(M) Exs. 4, 6, 10, 12.) The Plan did not initially exercise its subrogation rights and participate in the suit or the negotiations with the third party.[6] It has never been certain that the third parties would cover all of John's medical bills even if the court did not apply the make-whole provision. Hartenbower could have dropped his suit against the third parties; with no benefits from the third parties, the

Plan would be liable as an excess insurer for all of the expenses. Hartenbower could have refused to settle with the third parties for their proposed amount because they did not make him whole; the Plan would be liable because no other insurance would then be "available."

Several months after John's injury, N.R.O. (then doing business as Electrical Specialties) was sold and canceled its health plan and its stop-loss insurance. Although Hartenbower's claim had not been resolved, the Plan did not plan for any potential liability. (See N.R.O.'s 12(M) Ex. 10 (inquiry by plan administrator for disposition of Hartenbower claim before cancellation of Plan), Ex. 11 (deposition of N.R.O.'s owner, Nicholas Owens, acknowledging that no money allocated for potential liability with Hartenbower claims).) Furthermore, N.R.O. never initiated a claim with their stop-loss insurer, which covered the employer when payments to a beneficiary exceeded $10,000 in a calendar year. (VASA 12(M) ¶ 22.) Although the stop-loss insurance was only available for expenses incurred and paid by the employer, (*Id.* ¶ 19), the court finds it curious that N.R.O. would assume that it would never have any liability to Hartenbower and did not attempt to share the liability with its stop-loss insurer.

A reasonable fact-finder could determine that N.R.O. acted in an arbitrary and capricious manner. The following as-yet-unanswered questions illustrate this point. One, why did the Plan assume that it would never be in a position as an excess insurer? Two, why did the Plan not reduce its potential liability by getting its stop-loss insurer involved? Finally, does a conflict of interest exist because of the temporal relationship between denying the Hartenbower claims and the selling of the business? Less than nine months after John Hartenbower's injury, Electrical Specialties was sold to Tran-Technology, (Plan's 12(M) Ex. 10; VASA's 12(M) ¶ 15), N.R.O. canceled the Plan because it no longer had any employees, (*id.* Ex. 11), and it canceled the stop-loss insurance policy, (VASA's 12(M) ¶ 18). A reason-

6. The Plan finally intervened in the suit against Carolyn Dent, the third party tortfeasor, approximately four years after John Hartenbower was injured.

able fact-finder could determine that the Plan denied the Hartenbower claims because of the need to make N.R.O.'s balance sheet attractive to its new buyer. Consequently, even without applying the make-whole doctrine, the court would deny the Plan's motion for summary judgment because of the existence of genuine issues of material facts.

### C. Excess Insurance Clause: Common Fund Doctrine

Even if the make-whole doctrine does not apply and the Plan did not operate in an arbitrary and capricious manner, the Plan is still not entitled to summary judgment because the Illinois common fund doctrine applies. "The common fund doctrine permits a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." *Scholtens v. Schneider*, 173 Ill.2d 375, 219 Ill.Dec. 490, 495, 671 N.E.2d 657, 662 (1996). Hartenbower argues that they should subtract his costs to litigate against the third party tortfeasor from the recovery before determining if the Plan is in an excess insurer position (Pl. Resp. to Plan's Mot. At 5.) Hartenbower has incurred at least $33,000 in attorney fees. (Id. Ex. A.) Therefore, under the common-fund doctrine, the proposed $100,000 settlement from the third-party tortfeasors will first be allocated to attorney fees. This will leave less than $67,000 to cover medical bills that are now more than $89,000. (*Id.* at 4.) Consequently, as an excess insurer, the Plan will be liable for the difference.

■ Although ERISA "supersede[s] any and all State laws insofar as they ... relate to any employee benefit plan." outlined in the statute, 29 U.S.C. § 1144(a) (1994), the Illinois common fund doctrine still applies; *see also Travelers*, 514 U.S. at 651, 115 S.Ct. at 1674–75. The Seventh Circuit recently determined that Illinois' common fund doctrine does not "relate" to employee welfare plans. *Blackburn*, 115 F.3d at 495. "The common-fund doctrine long predates not only ERISA

but also employer-sponsored health plans Most applications have nothing to do with health insurance in general, or employer-sponsored plans in particular." *Id.*

As discussed in Section I–B, the Plan did not participate in the claims against the third parties yet they want the benefit of all funds that accrue from that settlement. The Illinois Supreme Court faced the same situation in *Scholtens*, 219 Ill.Dec. at 492, 671 N.E.2d at 659, and stated that spreading the cost of litigation to all beneficiaries of a settlement avoids having one party being unjustly enriched by the efforts of another, *id.* at 496, 671 N.E.2d at 663. Furthermore, the Seventh Circuit determined that "if preemption of [Illinois'] common-fund doctrine [by ERISA] meant that injured persons could not charge legal costs against recoveries, [plaintiffs] would in the future have every reason to disclaim any demand for medical expenses in tort suits, throwing on plans the burden and expense of collection." *Blackburn*, 115 F.3d at 496.

■ Illinois' common-fund doctrine applies, and Hartenbower is entitled to pay his attorney fees out of the settlement from the third-party tortfeasor before allocating any funds for medical bills. Therefore, the court denies the Plan's motion for summary judgment because it is liable for at least any medical bills that the third-party settlement would not pay after the attorney fees are removed.[7]

### D. Subrogation Clause

The Plan argues that it is entitled to summary judgment because Hartenbower has not executed the subrogation agreements that the plan document requires. Hartenbower argues that he does not have to execute the subrogation agreement until the Plan has initiated payments. The court finds Hartenbower's argument more persuasive.

■ Subrogation agreements give insurers the right to recover monies, which insurers initially paid, from third parties who are legally liable for injuries. *Barnes*, 64

---

**7.** The Seventh Circuit left open in *Blackburn* the possibility that express language in a plan could overrule the common-fund doctrine. 115 F.3d at

**496.** Because the Plan did not contain any such language, there is no need to address this issue at this time.

F.3d at 1392. Generally, "[n]o right of subrogation arises until the claim has been paid. Thus, before subrogation can be had, the insurer must have paid the insured his loss according to the contract ... And the insurer is only subrogated to the extent of its payment." 16 *Couch on Insurance 2d* § 61:49 at 133–34. In *Barnes*, the plan's subrogation agreement stated that "*if this plan makes payment* which the employee, dependent or any other party is or may be entitled to recover against any person or organization responsible for an accident or illness, this Plan is subrogated to all rights of recovery to the extent of its payment." 64 F.3d at 1393 (emphasis added). Consequently, the court held that "the Plan's right to subrogation arises only after the Plan makes payment to the insured." *Id.* In *Cagle*, where the plan made an initial payment but the beneficiary refused to sign the subrogation agreement, the court ruled that further payments by the plan could be withheld. *Cagle*, 112 F.3d at 1520.[8]

Employee welfare plans governed by ERISA escape this requirement if they contain explicit language that precludes benefit payments before the beneficiary signs a subrogation agreement. *See, e.g., Preze v. Board of Trustees, Welfare Fund Local 597*, 5 F.3d 272, 274–75 (7th Cir.1993). In *Preze* the plan document stated that "no benefits will be paid on [claims for which a third party may be legally responsible] *unless* the eligible Employee ... executes a written subrogation agreement." *Id.* at 273 (emphasis added).

■ The N.R.O. plan does not explicitly state that the participant or beneficiary must sign the subrogation agreement before the payment of benefits. The Plan would have the court follow the unpublished decision of

the district court in *Mahrt*, No. 93–1389 (C.D.Ill. Oct. 14, 1994). In subrogation language identical to the Plan's, the court found that the "provision provides that benefits may be withheld if a Covered Person or Covered Dependent fails to comply with a request by the Plan to execute a subrogation agreement." *Id.* at 12 n. 7. This court finds this reasoning unpersuasive and respectfully declines to follow it. In fact, the Plan is subrogated "*[i]n the event* any benefits or services of any kind are furnished ... or payment made ... for a physical condition or injury caused by a third party." (Plan's 12(M) Ex. 2 at 33.) Although the Plan has the discretion to interpret the plan language, interpreting it any other way is not reasonable. The purpose of a subrogation clause is to allow the plan to recover funds *that it has expended* from third-party tortfeasors. Until it has paid some benefits to its beneficiaries, a signed subrogation agreement is unnecessary. Furthermore, the Plan's decision may be arbitrary; it has not introduced any evidence to suggest that it always insists upon a signed subrogation agreement before making any payments.[9] Consequently, the court denies the Plan's motion for summary judgment. If Hartenbower still refuses to sign the subrogation agreement after the Plan reasonably initiates benefit payments, the Plan may be free to suspend future payments until Hartenbower executes the agreement.[10]

## II. THE EMPLOYER

In its Amended Complaint, Hartenbower seeks a declaratory judgment action that N.R.O. Enterprises, Inc. f/k/a Electrical Specialties Co. ("N.R.O.") has an obligation to reimburse Hartenbower for medical expenses incurred because of John Hartenbower's accident. (Am.Compl.¶¶ 16, 20.) N.R.O. ar-

---

8. The *Cagle* subrogation agreement stated in pertinent part: "If you or one of your dependents ... should *receive benefits* from the Fund for injuries caused by someone else ..., the Benefit Fund through subrogation has the right to seek repayment from the other party or his insurance company.... [Y]ou may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund." *Cagle*, 112 F.3d at 1517–18 (emphasis added).

9. The Plan is, of course, able to amend the plan language to include verbiage similar to that found in *Preze*, 5 F.3d at 273 (denying benefits *until* subrogation agreement executed).

10. The executed subrogation agreement eases the ability of the insurer to be reimbursed from a third-party tortfeasor. Therefore, as long as the lack of a signed agreement does not permanently prejudice the insurer from being reimbursed, the failure of the beneficiary to sign it should not be a permanent bar.

gues that it is not a proper party to Hartenbower's suit. (Plan's Mem. Supporting Mot. at 13.) The court agrees with N.R.O. and grants its motion for summary judgment.

ERISA grants participants or beneficiaries the right to bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (1994). In this kind of action, the defendant is the plan, not the employer. *Pecor v. Northwestern Nat'l Ins. Co.*, 869 F.Supp. 651, 653 (E.D.Wis. 1994). Furthermore, the employer's assets are not subject to seizure under section 1132(a)(1)(B). *Id.*

A beneficiary can also sue for breach of fiduciary duty. §§ 1132(a)(2), 1109(a). "An action to recover from a breach of fiduciary duty occurred is distinct from an action to recover plan benefits under section 1132(a)(1)(B) of [ERISA] ... [W]hen a plaintiff's ERISA claim is based upon a breach of fiduciary duty, the plaintiff must bring the action under section 1132(a)(2) and not 1132(a)(1)(B)." *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 992 (7th Cir. 1993) (citations omitted). Congress intended to create a cause of action under 1132(a)(2) to protect plan assets, not the rights of individual plan participants. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134. 142, 105 S.Ct. 3085, 3090, 87 L.Ed.2d 96 (1985). Therefore, recovery for a breach of fiduciary duty inures to the plan itself and not to an individual. *Id.* at 140, 105 S.Ct. at 3089. Furthermore, because Congress specifically delineated civil actions in section 1132, the Court will not infer them elsewhere. *Id.* at 146, 105 S.Ct. at 3092.

Hartenbower brings this action to determine the status of benefits but seeks to include N.R.O. for breach of fiduciary duty. (*See* Pl. Resp. to Plan's Mot. at 17.) Because Hartenbower brings this action on his son's behalf, he does not have standing to pursue N.R.O. for breach of fiduciary duty. He could sue for breach of fiduciary duty against N.R.O. if he sought a remedy on behalf of the plan itself. The fiduciary duty of N.R.O. does not make it liable to an individual beneficiary for plan benefits; this duty makes it liable to the plan. Consequently, the court grants N.R.O.'s motion for summary judgment.

## III. THE STOP–LOSS INSURER

Hartenbower seeks a declaratory judgment against North Atlantic Casualty and Surety Insurance Company Inc., a k/a VASA North Atlantic Insurance Company ("VASA") making it liable for all or some John Hartenbower's medical bills. VASA argues that its privity of contract was with N.R.O. and not with Hartenbower or any plan participant. The court agrees with VASA.

N.R.O. purchased a stop-loss insurance policy from VASA on or before March 1, 1992. (VASA Mem. Supporting Mot. Ex. B.) Stop-loss insurance covers the employer not the employee. *Thompson v. Talquin Bldg. Prods. Co.*, 928 F.2d 649, 653 (4th Cir.1991) (finding that "[t]he purpose of the stop-loss insurance is to protect [the employer] from catastrophic losses, it is not accident and health insurance for employees). Courts should use the clear language of a policy to see who is insured." *See Auto Club Ins., Ass'n v. Safeco Life Ins. Co.*, 833 F.Supp. 637, 640 (W.D.Mich.1993).

VASA "shall become liable for claims paid by [N.R.O.] for any one participant in excess of [$10,000] provided these claims are incurred and paid during the period of this Contract." *Id.* In other words, VASA provides insurance to N.R.O. in situations where N.R.O. has paid to a Plan participant more than $10,000 in a calendar year. VASA is not providing any benefits directly to any Plan participant or beneficiary and has no obligation to them. Consequently, the court grants VASA's motion for summary judgment because Hartenbower and VASA do not have a privity of contract and VASA does not have any legal obligation to Hartenbower.[11] VASA argues that it is also entitled

---

11. Hartenbower is correct that there is an issue of material fact as to whether VASA had a fiduciary responsibility to the plan. (*See* VASA Mem. Supporting Mot. (attached letters from Robert

888

to summary judgment because (1) N.R.O. never filed a claim with it, (2) N.R.O. canceled its policy with VASA, (3) N.R.O. breached its policy with VASA by failing to notify VASA of the sale of Electrical Specialties, and (4) N.R.O. did not pay any claims while the policy was in force. (VASA Mot. at 1–2). Because the court finds that Hartenbower does not have any legal claims against VASA, the court need not address these other issues.

### Conclusion

For reasons set forth above, the motion for summary judgment filed by Defendants N.R.O. Enterprises and Electrical Specialties Co. Health Benefit Plan is granted with respect to Defendant N.R.O., Enterprises, Inc. but denied with respect to Electrical Specialties Co. Health Benefit Plan. The motion for summary judgment filed by Defendant North Atlantic Casualty and Surety Insurance Company is granted, and their motion to submit supplemental authority is also granted. The remaining parties should discuss settlement before the next court date.

Riffle, plaintiff's attorney, to Joel Cutler and Patty Dorson of VASA indicate possibility that VASA involved in decision not to pay benefits to plaintiff); Pl. Resp. to VASA Mot. Ex. C at 32 (asserting that VASA's input was needed by Plan before making recommendation to N.R.O. on whether to pay Hartenbower claims).) But, as indicated in part II *supra*, VASA's fiduciary responsibility is irrelevant to a claim by Hartenbower for denial of benefits.